PC SCAN

FILED

5/28/2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| William D. Riley EL, Plaintiff | ) |
| | ) Case No. 15 CV 11180 |
| vs. | ) |
| | ) Honorable Judge John Z. Lee |
| Salvador Godinez et. al., Defendants. | ) |
| | ) Magistrate Judge Young B. Kim |
| | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS RESPONSE TO DEFENDANTS FED. R. CIV. P. 56 <u>MOTION FOR SUMMARY JUDGMENT</u>

Now comes Plaintiff, William D. Riley EL, pro se, responds to Defendants' Motion for Summary Judgment as follows:

## I. <u>FACTS</u>

1. The Plaintiff, William D Riley-EL, is an inmate at Stateville Correctional Facility ("Stateville"), in the custody and control of the Illinois Department of Corrections ("IDOC"). Plaintiff has brought this lawsuit pursuant to 42 U.S.C. § 1983 alleging three counts of retaliation, in violation of his First Amendment rights, against thirteen current and former employees of the IDOC. Specifically, Plaintiff contends that Defendants conspired to engage in a pattern and practice of harassment, by issuing bogus disciplinary reports against plaintiff, in retaliation for filing prior grievances, and lawsuits against the prison administration. See Ex. 1, Pla. Ver. Compl., Ex. 2 Pla. Depos.

---

[1] All exhibits references are made to "Defendants' Local Rule 56-1 Statement of Material Facts."

2. Plaintiff was subjected to shakedowns, strip searches, retaliatory transfer, and false disciplinary reports, in retaliation for grievances and lawsuits filed prior to November 7, 2013, and a continuous pattern and practice of harassment and retaliation after November 7, 2013 to 2016, that would have deterred a person of ordinary firmness from exercising his First Amendment rights. See Ex #2. Pla. Depos. 86:6-90:22, Ex #1 Pla. Verified Compl. parag. 20-26, ex. 1-1A, 2-2E, 3-3B, 8-8A, 9-9C.

3. Defendant Lemke engaged in arbitrary and malicious actions against Plaintiff on or about the date of November 7, 2013, by authorizing the extraction of Plaintiff from cell D-142 by "Orange Crush", and tactical officer Hamilton, who subjected plaintiff to three unconstitutional strip searches shakedowns, a retaliatory transfer on November 7, 2013, for filing grievances and lawsuits against Defendant Lemke (Warden), and other prison officials. See Ex #2, Pla. Depos. 20:20-23, Ex #1 Pla. Ver. Compl. parag. 20-26, Ex. 1-1A, 2-2E, 3-3B.

4. Defendants Lemke and McGarvey engaged in further harassment and retaliation by placing plaintiff on the closed maximum security wing at "Stateville" on or about the 12TH of November 2013, without a hearing or a investigation or disciplinary infraction being wrote. See Ex #2 Pla. Depos. 41:12-13, Ex #1, Pla. Ver. Compl. parag. 20-26, Ex. 1-1A, 2-2E, 3-3B, 8-8A.

5. Defendant Shaw engaged in further harassment and retaliation by writing a trumped up investigation report (11/24/13), then two day late a disciplinary report (11/26/13), after plaintiff wrote a grievance on or about 11/19/13, pertaining to the events that occurred on November 7, 2013, whereby plaintiff placed said grievance on his cell bars for mail pick-up. See Ex #2, Pla. Depos. 21:22-24; 24, Ex 1. Pla. Ver. Compl. 20-26, ex. 3-3b.

6. Defendants, Laskey and McGarvey, engaged in further harassment and retaliation against Plaintiff by authorizing the implementation of the investigation report (11/24/13), and the disciplinary report (11/26/13, whereby the Defendants signed-off on both reports beyond the authorized time frame required by 504.30(f) of the 20 Ill. Admin Code. See Ex #1 Pla. Ver. Compl, Ex 1-1A, 2-2E, 3-3B

7. Defendant, C. Wright, engaged in further harassment and retaliation by adjudicating a disciplinary report (11/26/13, 12/10/13), that was bogus on its face, and finding Plaintiff guilty of charges, that otherwise wouldn't have been written, but for retaliatory purposes. See, Ex #1 Pla. Ver. Compl. Ex 1-1A, 2-2E, 3-3B.

8. Defendants, Laskey, McGarvey, and Magana, engaged in further harassment and retaliation by failing to release Plaintiff from punitive isolation/Administrative Detention, once Plaintiff got the disciplinary report expunged, and refused to return Plaintiff's property once the disciplinary report was expunged, so plaintiff was never made whole, because defendants claim that Plaintiff's property was either lost or destroyed by defendants, and Plaintiff did three months of segregation for an unsubstantiated truped up charge by defendants. See Ex #1 Pla. Ver. Compl., Ex 5-5A.

9. Defendants, Shaw, Clements, Laskey, McGarvey, Range, C. Best, Mansfield, and T. Williams, engaged in further harassment and retaliation by issuing another disciplinary report on or about the date of June 13, 2014, for conspiracy to STG activity, but Plaintiff was never released from punitive isolation/Administrative Detention. Plaintiff filed numerous grievances after the first disciplinary report was expunged, which were dated 2/10/14, 3/12/14, 3/12/14, 3/14/14, 3/27/14, 3/27/14, 4/5/14, 4/17/14, 4/24/14, 5/9/14, Defendants continued their course and pattern of harassment by issuing a guilty ruling and giving plaintiff a year across the board, meaning a year segregation, C-Grade, commissary denial, visit restriction. See Ex #1 Pla. Ver. Compl. Ex 8-8A, 9-9C, 10-10A, 11-11A, 12-12A, 13-13B, 14-14C, 15-15A, 16-16A, 17-17A, 19-19A.

10. Defendants Shaw, Clements, Best, Hesselton, Fredericks, Marshall, engaged in further harassment and retaliation, by issuing another bogus disciplinary report, by finding Plaintiff guilty, and issuing Plaintiff another year across the board, for the disciplinary report dated 10/19/15. See Ex #1 Pla. Ver. Compl. count III

## STANDARD OF REVIEW

11. Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

12. A genuine issue of material fact exist if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Id. at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts". Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)." The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." Anderson, 447 U.S. at 252.

## ANALYSIS

13. To establish a prima facie case of retaliation, an inmate must produce evidence that a protected activity was "at least a motivating factor" in retaliatory action taken against him, i.e., action that would likely deter protected activity in the

future." *Mays v. Springborn*, 719 F.3d 631, 635 (7TH Cir. 2013)(quoting *Mays v. Springborn*, 575 F.3d 643, 650 (7TH Cir. 2009). That is, he must show three things: (1) that he engaged in constitutionally protected speech; (2) that he suffered a deprivation likely to deter future protected speech; and (3) that his protected speech was at least a motivating factor in the defendants actions. See *Gomez v. Randle*, 680 F.3d 859, 846 (7TH Cir. 2012); see also *Antoine v. Ramos*, 497 F. Appx 631, 633 (7TH Cir. 2012)(citing Kidwell v. Eisenhauer, 679 F.3d 957, 965 (7TH Cir. 2012)). If the inmate satisfies these elements, the burden shifts to the defendants, who must rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *Mays*, 719 F.3d at 635; *Antoine*, 497 F. Appx. at 635, *Mays*, 575 F.3d at 650.

14. The defendants cannot be found liable if they would have conducted the shakedown no matter what. *Antoine*, 497 F. Appx at 634. Thus, "if the defendants produce evidence that they would have taken action against Plaintiff even in the absence of his speech, Plaintiff would also have to show that those reasons were pretextual." *Sweringen-El v. Cook County Sheriff's Dept.* 602 F.3d 852, 861 (7TH Cir. 2010)." At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie". *Zellner v. Harrick*, 639 F.3d 371, 379 (7TH Cir 2011); see also *Valentine v. Vill. of S. Chi. Heights*, 575 F.3d 644, 670 (7TH Cir. 2009) ("The plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the defendants reasons were merely a pretext for the adverse action, at least in part, for exercising his First Amendment rights").

# ARGUMENT

15. The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. *Farrow v. West*, 320 F.3d 1235, 1248 (11TH Cir. 2003); Accord. *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10, 118 S. Ct. 1584 (1998)("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right."); *Hoskin v. Lenear*, 395 F.3d 372, 375

(7TH Cir. 2005)(per curiam)("Prisoners are entitled to utilize available grievance pro-
cedures without threat of recrimination..."); Scott v. Coughlin, 344 F.3d 282, 287-88 (2d.
Cir. 2003)("... [Plaintiff's] involvement in filing claims against prison officials and helping
others do so was protected activity, as it was an exercise of his right to petition
the government for redress of grievances under the First Amendment.")

16. "It is also unconstitutional to retaliate against prisoners for exercising the
right of access to courts." Prison officials may not retaliate against prisoners for using the
courts or trying to do so. (The protected act of trying to gain court access
should include whatever actions a prisoner needs to take in order to get his
claim into court. In Siggers-El v. Barlow, 412 F.3d 693 (6TH Cir. 2005), a prison
employee, refused to process a disbursement the plaintiff needed in order to
retain a lawyer to file a court action; the prisoner went over the employee's
head to his supervisor, and suffered retaliation as a result. The court rejected
defendants' claim that going to a higher official was not constitutionally protected
holding that it was "part of his attempt to access the courts." 412 F.3d at 699. What
ever the form of the retaliation. (DeTomass v. McGinnis, 970 F.2d 211, 214 (7TH Cir.
1992) ("Whether the retaliation takes the form of property or privileges does not
matter") (dictum).

17. In the instant case, Plaintiff wrote grievances on or about the date of
6/5/13, complaining of Staff Conduct, Dietary, Medical Treatment, ADA Disability
Accommodation, and Therapuethic Diet, to Warden Lemke, who responded by denying
said emergency grievance on 6/25/13. On 6/15/13 Plaintiff filed another
grievance pertaining to Staff Conduct, Medical Treatment directly to counselor
Bishop, on 7/14/13 Plaintiff filed an emergency grievance directly to Warden
Lemke again pertaining to Staff Conduct, Medical Treatment, and Dietary, Warden
Lemke responded on 7/19/13 by denying the grievance. On 7/31/13 Plaintiff filed
another directly to counselor Bishop who recieved the grievance on 8/9/13, pertaining
to Staff Conduct, and ADA Disability Accommodation. On 9/10/13 Plaintiff filed an emer-
gency grievance directly to Warden Lemke, who received it on 10/1/13, which pertained
to Staff Conduct, and Medical Treatment. These grievances were used to file law-
suits in Federal Court, in late September or early October.[203] (13 CV 5768, 13 CV 5771, 13 CV 5773)
(13 CV 8656)

18. On or about the date of November 4th or 5th of 2013, Plaintiff had a brief conversation with Warden Lemke in D-House, at Plaintiff's cell assignment "D-142", whereby Plaintiff asked Warden Lemke about an extra mattress, which Plaintiff was entitled to because it was medically prescribed by the Medical Director, back in July of 2013, but Plaintiff hadn't received it yet, and was suffering severe back pain daily, and Plaintiff explained this to Warden Lemke. Warden Lemke asked for Plaintiff's name and number, put it in his phone and stated " let me check on them, we have some on order."

19. Warden Lemke and his staff, both Assistant Wardens were in D-House, because about four or five inmates had gotten shot in the dinning hall at lunch time on this day, and they were checking on the inmates in D-House. Plaintiff was talking to one of the individuals who got shot and was giving him sound legal advice on what he should do moving forward, and c/o Mrs. Williams overheard Plaintiff and ran from her desk at the door, to the Sgt. Office, and told the Lt. and Sgt. what Plaintiff was saying. Two or three days later Plaintiff was being extracted from his cell assignment by a tactical response team, and stripped searched three times before being transferred to another Prison without any of Plaintiff's property, which happened on November 7, 2013, the first act of harassment and retaliation against Plaintiff. (With regard to Plaintiff's allegations of retaliation, an act in retaliation for the exercise of a constitutionally protected right violates the Constitution. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Dale, 429 U.S. 274, 283-84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Motzker v. Hert, 748 F.2d 1142, 1150 (7th Cir. 1984), limited on other grounds, Salazar v. City of Chicago, 940 F.2d 233, 240-41 (7th Cir. 1991).

20. Prisoners have a constitutional right of access to the courts that, by necessity, includes the right to pursue the administrative remedies that must be exhausted before a prisoner can seek relief in court. See Preiser, 411 U.S. at 493, 93 S.Ct. 1827. Thus, a prison official may not retaliate against a prisoner because that prisoner filed a grievance. See Babcock, 102 F.3d at 274-75; Black, 22 F.3d at 1402-03; see also Higgason, 83 F.3d at 810 (retaliation for filing lawsuits); Murphy v. Lane, 833 F.2d 106, 108-09 (7th Cir. 1987). This is so, even if the adverse action does not independently violate the Constitution. See Babcock, 102 F.3d at 275.

21. "To state a cause of action for retaliatory treatment, a complaint need only allege a chronology of events from which retaliation may be inferred." Black, 22 F.3d at 1899. A strip-search in jail or prison can be cruel and unusual punishment. See Mays v. Springborn, 575 F.3d 643, 649 (7th Cir. 2009); Peckham v. Wisconsin Dept. of Corrections, 141 F.3d 694, 697 (7th Cir. 1998). A prisoner states a claim under the Eighth Amendment when he plausibly alleges that the strip-search in question was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons. See Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir. 2003); Merriwether v. Faulkner, 821 F.2d 408, 418 (7th Cir. 1987); see also Hudson v. Palmer, 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)(Eighth Amendment protects against "calculated harassment unrelated to prison needs"). Even where prison authorities are able to identify a valid correctional justification for the search, it may still violate the Eighth Amendment if "conducted in a harassing manner intended to humiliate and cause psychological pain." Mays 575 F.3d at 649. In short, where there is no legitimate reason for the challenged strip-search or the manner in which it was conducted, the search may "involve the unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

22. On November 7, 2013, Plaintiff was subjected to a cell extraction at 7am, whereby, tactical officer ran through D-House (Unit Delta), where Plaintiff was assigned. Three tactical officers stood in front of cell assignment "D-142", and a "Special Operation Response Team (S.O.R.T) member came and asked Plaintiff his name. Once Plaintiff was identified the S.O.R.T. team member gave direct orders to Plaintiff and his cellmate. The S.O.R.T. member told Plaintiff to strip and ordered the cellmate to face the back wall of the cell. Then Plaintiff and the cellmate switched areas, and the cellmate was stripped. (1st strip search). Then both inmates were handcuffed and walked to the dining hall. Plaintiff ambulates with a crutch since at least 2006, and has had knee problems since 2000. Plaintiff was also suffering from uncontrollable blood pressure (hypertension), stage 4 or 5 (ESRD), end stage renal disease, when these events took place.

23. While waiting in the dinning hall Plaintiff's name was called, and Plaintiff was ordered, and escorted to a movement room with more inmates and tactical officers. Plaintiff was lined up against a wall with other inmates and told to strip again.

24. The process of the strip search consist of taking all your clothing off in front of everybody, where the tactical officers deliberately inspect the bodies of each prisoner. The search examined each prisoner's head, mouth, genitals, buttocks, legs and toes. Plaintiff asserts that tactical officers ordered each prisoner, at the same time, to "open his mouth, to stick his tongue out, up and down," and "run your fingers through your hair, flap his ears, grab his genitals, pull the foreskin back on your penis, after that, lift up your scrotum, turn around, bend over at the waist, take your hands, spread your buttocks then come back up and lift your right foot and left foot and wiggle your toes."

25. After the strip search process for the second time this morning of November 7, 2013, Plaintiff was ordered and escorted back to the dinning hall in handcuffs with his crutch, and sat on the opposite side of the dinning hall away from the others, the other twenty or so prisoners that was in the dinning hall. After the other prisoners were stripped searched, a tactical officer came and called five names, Plaintiff's name was one of them, we, the five prisoners, were seperated to one side of the dinning hall, then ordered and escorted back to the movement room again, this time there was five jumpsuits, thats worn when you're being transferred. We were lined up against the wall and ordered to strip again, and put through the same process described above. This was the third time this morning that Plaintiff was put through this strip-search process. Once Plaintiff got to Menard he was strip-searched again for the forth time. A retaliatory transfer. See Higgason v. Farley, 83 F.3d 807, 816 (7th Cir. 1996) ("If a prisoner is transferred for exercising his own right of access to the courts, or for assisting other in exercising their right of access, he has a claim under § 1983") see also Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) ("We ... hold that the retaliation cause of action ... survives Sandin.").

26. Mr. Riley EL on November 9, 2013 was transferred back to Stateville prison. Mr. Riley EL was placed in the health care unit infirmary from the 9th of November, to the 12th of November, 2013. Mr. Riley EL was placed on the closed maximus security wing in X-House, with nothing but a mattress and the jumpsuit he was wearing. Mr. Riley EL asked about his property that was left in his cell assignment, when he was transferred to Menard prison on the 7th of November. Mr. Riley EL found out later that Major McGarvey ordered personal property officers to label all Mr. Riley EL's property EXCESSIVE, because they Unit Delta staff felt embarrassed because Mr. Riley EL, has so much property, that he couldn't have been in cell compliance, so all Mr. Riley EL's property, EXCEPT for his legal material, was confiscated by property, and labeled EXCESSIVE, but there wasn't a disciplinary report written, and the Adjustment committee, is the only entity within the 20 Ill. Admin. Code that has the power to make a legitimate decision on the disposition of my property. That didn't happen here, it was totally by passed and I was given a confiscation, disposition sheet from property with all my property listed on it with three (3) options on it ("Authorize to have it destroyed," "mail out on visit," or "file a grievance, but Mr. Riley EL's property was NEVER given back, and eventually was told that his property was either destroyed or lost. Another act of retaliation.

27. On or about November 9, 2013 Mr. Riley EL filed a grievance pertaining to the arbitrary treatment he was put through on November 7, 2013 with the cell extraction, the strip searches, the denial of food and water, the retaliatory transfer, the whereabouts of his property, the labeling of Mr. Riley EL as a gang-leader, and so forth. The grievance was placed in the institutional mail on or about the night of November 9th, 2013 to counselor Healthcare unit, because Mr. Riley didn't know who the counselor was, and the health care staff didn't either. So Mr. Riley EL's grievance eventually landed in the hands of counselor A. Hall on 11/29/13. It either floated around from desk to desk or it sat on counselor's A. Halls desk for twenty days. Mr. Riley EL contends that he didn't receive a investigative report until his grievances were filed. Then two days later after this bogus investigative report (November 24, 2013) by % Shaw, a disciplinary report was received by plaintiff on November 26, 2013. Mr. Riley EL contends that defendants Shaw, Laskey, McGarvy, and Lake who authorized the bogus disciplinary charges conspired with Torri, and Range to attempt to try and fix their mistakes, by rewriting the bogus disciplinary report. Lt. C. Wright heard the bogus disciplinary report where

Mr. Riley EL by reading his written statement, explained that the disciplinary report was beyond the time frame to be served upon a prisoner and %Lt. Wright stated "It all depends on who counting the days." With that statement from %Lt. Wright Mr. Riley EL knew he wasn't going to beat the disciplinary report even though it was bogus. %Lt. Wright conspired with other defendants to up hold the bogus disciplinary report by finding Mr. Riley EL guilty of said disciplinary report in retaliation for filing a lawsuit against him. (11cv 4401) Mr. Riley EL received (3) three months segregation, C-Grade, commissary denial, visit restriction for the bogus disciplinary report. Mr. Riley EL filed a grievance on or about 1/15/14, grievance #562, which ruled that the 205 charge is not substantiated. The counselor Anna McBee recommended that the disciplinary report be expunged. Warden Magana concurred the decision on 2/28/14. Mr. Riley EL had a discussion with Warden Magana in late January, early Febuary of 2014 about the disciplinary report. It consisted of me showing him the ruled book, and the section 504.30(f) of the Admin. Code, where by it stated that "no investigative or disciplinary report may be served no more that eight days upon an adult offender. Once I showed Warden Magana my dates on the disciplinary report he tried to tell me that, that is not what that means. Warden Magana conspired with the other defendant to keep me in isolation. Mr. Riley EL was not released from his isolated state, nor was his property returned, defendants held Mr. Riley EL in a isolated state and engaged in more retaliatory acts of calculated harassment, by refusing to restore Mr. Riley EL back to the position he was in prior to the bogus disciplinary report. On 3/12/14 Mr. Riley EL, filed a grievance for "Personal Property, Staff Conduct, Harassment and Retaliation." On 4/24/14, Mr. Riley EL filed another emergency grievance #1313 for "Personal Property, Staff Conduct, Defamation, Harassment and Retaliation. On 5/6/14 Warden Tarry Williams received and responded to it on 5/7/14, denying said grievance. Mr. Riley EL was eventually written another disciplinary report in retaliation for filing grievances, whereby the same information was used from the first disciplinary report in this second disciplinary report for 205, by the same defendants Shaw, Laskey, McGarvey, Range, and Clements. Mr. Riley EL was found guilty, even though he was never released from isolation, of the disciplinary charges by Adjustment Committee members %Lt. Best, and counselor D. Mansfield. Mr. Riley EL received 1 year segregation, 1 year C-Grade, 1 year Commissary denial, 1 year Visit restriction, and transferred to Pontiac prison and placed in North Administrative Detention isolation unit. Mr. Riley EL completed the year and was held at Pontiac prison in Administrative Detention. Mr. Riley EL also

was sick and suffering through the whole ordeal, from hypertension, severe knee pain, back pain (lower), and end stage renal disease (ESRD), whereby Mr. Riley EL lost 50lbs of muscle mass and was close to death when his kidneys failed. Mr. Riley EL was sent to U.I.C in July of 2015, and admitted to receive his first dialysis treatment of three at UIC. Mr. Riley EL was transferred back to Stateville prison once he was released from the hospital straight to Stateville prison. Mr. Riley EL was transferred back to Stateville prison because it is the only maximum security prison in Illinois that provides hemodialysis treatment to prisoners. Mr. Riley EL's legal property that was in his cell at Pontiac prison was packed and shipped to Stateville prison by prison officials. Mr. Riley EL was held in Administrative Detention (A.D.) status at Stateville prison upon his return in July of 2015, even though, now, he's a hemodialysis patient and receives treatment (3) three times a week for the rest of my life. In early September of 2015, Mr. Riley EL received a A.D. hearing to determine if it was necessary to continue to hold Mr. Riley EL in isolation. Mr. Riley EL went to the A.D. committee hearing and spoke his truths, which was enough to convince the committee to vote in Mr. Riley EL's favor to release him from A.D. isolation. On or about October 19th of 2015, both Internal Affairs and the Intelligence officers came to Mr. Riley EL's cell assignment to shakedown his property and cell. %o Shaw and %o Clements went downstairs to the storage area, where the excess legal boxes are kept. %o Shaw and %o Clements went through Mr. Riley EL's excess legal boxes/material, and claimed that contraband was found in the nature of STG related material, and wrote Mr. Riley EL another bogus disciplinary report for 205, and Mr. Riley EL was found guilty by %o Lt. Best and Jill Hossetton of the Adjustment committee, and received 1year segregation, 1year C-Grade, 1year Commissary denial, 1year Visit restriction. Mr. Riley EL contends that defendants actions were a continuous sadistical and malicious pattern, and campaign to harass and retaliate against Mr. Riley EL due to the committee's ruling to release Mr. Riley EL from A.D. isolation. Defendants fabricated the disciplinary report of contraband because Mr. Riley EL's excess legal material was in the custody and control of correctional officers since the time Mr. Riley EL was first placed in isolation since November 7, 2013. Mr. Riley EL contends that on November 7, 2013 Mr. Riley EL had 21 excess legal boxes. Once Mr. Riley EL was transferred to Pontiac prison and his legal material was shaken down Mr. Riley EL only had nine legal excess boxes, so it would have been impossible for any contraband to be in my excess legal boxes, because Pontiac officials went through it piece by piece.

28. The allegations made in Plaintiff's complaint certainly present a chronology from which retaliation can be inferred. Again, Plaintiff's allegations adequately set forth a chronology of events from which retaliation may be inferred. See Black, 22 F.3d at 1399. To begin with, the alleged retaliatory actions began almost immediately after Plaintiff filed grievances and lawsuits against Defendants, which suggest a causal relationship. The same is true of Plaintiff's allegation that on several occasions, in the weeks and months after Plaintiff filed grievances, and lawsuits against said defendants, Plaintiff received unjustified disciplinary reports from other staff members, culminating in the incident involving I'A, S.O.R.T, and the arbitrary transfer of Plaintiff to Menard, and confiscation of all plaintiff's property as excessive.

29. Plaintiff allegations that the Wardens (Lemke, T. Williams, and Magana) failed to remedy or prevent the illegal actions taken by certain correctional officers / IA, is at bottom, a claim that the Wardens / Directors failed to protect Plaintiff from, and therefore condoned, the malicious campaign of harassment and retaliation he allegedly experienced. See Gentry v. Duckworth, 65 F.3d 555, 561 (7TH Cir. 1995); See also Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1189-92 (7TH Cir. 1986).

30. An official meets the "personal involvement" requirement when "he or she acts or fails to act with deliberate or reckless, disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at his or her direction or with his or her knowledge and consent." See Smith v. Rowe, 761 F.2d 360, 369 (7TH Cir. 1985)(citation omitted).

31. Plaintiff's contention that the disciplinary tickets was fabricated in retaliation for engaging in protected speech is properly within the scope of a § 1983 suit. Grieving about prison conditions is protected First Amendment Activity, Gomez v. Randle, 680 F.3d 859, 866 (7TH Cir. 2012), and Plaintiff argues that the temporal proximity of his various grievances, and the three lawsuits that were just filed prior to November 7, 2013 raised an inference that his First Amendment activity was a motivating factor for the strip searches,

retaliatory transfer, and placement on a maximum security closed unit in administrative detention, as well as the false disciplinary reports. Plaintiff contends that Defendants actions were based only on his First Amendment activity, because Plaintiff was properly placed at "Stateville" prison with a medical hold, and appointments to return to UIC Nephrology Clinic in the near future prior to being transfered to the other end of the state, "Menard" prison, where plaintiff couldn't receive proper medical treatment. This is something that Defendants wouldn't have done anyway, and was a retaliatory act that exposed their true intentions to harass and retaliate against Plaintiff.

32. Plaintiff also argues that "Defendants" - (Stateville Administration, Internal Affairs,/Intelligence officers), wrongfully engineered Plaintiff's punishment by fabricating a series of serious charges, knowing that the falsehood would lead to the Plaintiff's immediate placement in isolation, without any intervening hearing and then land him with 3 months in segregation, then a year segregation, and then again another year in segregation. You cannot be put into administrative segregation solely to punish you for filing a lawsuit. See Cleggett v. Pate, 229 F. Supp 818 (N.D. Ill. 1964). Nor can you be transferred to punish you for filing a lawsuit, whether for yourself, or for someone else. Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999).

33. The Defendants do not dispute these facts on their motion for summary judgment, and we have (7th Circuit) held that such temporal proximity between an inmates lawsuit and disciplinary action may serve as circumstantial evidence of retaliation. See Flaherty, 713 F.2d at 14; cf. Harris v. Fleming, 839 F.2d 1232, 1238 (7th Cir. 1988) (timing of litigation and alleged retaliation may be significant). In addition, Plaintiff alleges in his verified complaint, that must be taken as true, that he was awaiting further employeement as a teacher assistant (TA) prior to the events of November 7, 2013, and the Court has determined that evidence of prior good behavior also may be circumstantial evidence of retaliation. See Flaherty, 713 F.2d at 13.

34. Plaintiff has presented a narrative of events from which a reasonable jury could infer retaliation. Plaintiff also has offered evidence from which a reasonable fact finder could concluded that plaintiff suffered an adverse action or deprivation. Uncontroverted evidence demonstrates that plaintiff was subjected to shakedowns, strip searches, retaliatory transfer, and false disciplinary reports, and suffered other adverse consequences, kidney failure, as a result. See Antoine, 497 F. Appx at 633.

35. Accepting all his allegations as true, "one possible inference" of Plaintiff's complaint, Tamayo, 526 F.3d at 1081, is that the alleged harassment by numerous prison employees in a variety of ways over a period of several months and years would deter a person of ordinary firmness from exercising his First Amendment rights.

36. Judgment as a matter of law cannot be granted on an issue that turns on witness credibility. See Burger v. Int'l Union of Elevator Constructors, Local No. 2, 498 F.3d 750, 753 (7th Cir. 2007). There are disputed facts that must be presented to a jury. The credibility of the witnesses, to Plaintiff and Defendants alleged claims is a question for the trier of fact, and judgment as a matter of law cannot be granted on an issue that requires the court to weigh witness credibility. Hays v. Springborn, 575 F.3d 634, 650 (7th Cir. 2009).

WHEREFORE, Plaintiff respectfully request that the Court deny Defendant motion for summary judgment, and grant such other relief this court finds reasonable and just.

5/24/19

Respectfully submitted
[All Rights Reserved, UCC 1-308/1-207]
William D. Riley El ©™
William D. Riley EL ©™
B03069 STA. C.C.
P.O. Box 112
Joliet, Illinois [60434-0112]

# Exhibit 2

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4
 5   WILLIAM D. RILEY-EL,        )
     Inmate No. B-03069,         )
 6           Plaintiff,          )
        vs.                      )No. 15 CV 11180
 7   SALVADOR GODINEZ,           )
     et al.,                     )
 8           Defendants.         )
 9
10         The deposition of WILLIAM D. RILEY-EL,
11   Inmate No. B-03069, called for examination
12   pursuant to the Rules of Civil Procedure
13   for the United States District Courts
14   pertaining to the taking of depositions,
15   taken before Dawn C. Evers, a Notary Public
16   within and for the County of Cook and
17   State of Illinois, at 16830 South Broadway
18   Street, Crest Hill, Illinois, on the
19   21st day of September, 2018, at the hour
20   of 11:33 a.m.
21
22
23   Dawn C. Evers, C.S.R.
24   License No.: 084-004459
```
                                                    1

```
 1                I N D E X
 2   WITNESS                      EXAMINATION
 3   WILLIAM D. RILEY-EL
 4    By Ms. Shannon (Exam)             5
 5
 6
 7
 8
 9
10            E X H I B I T S
11   NUMBER                  MARKED FOR ID
12   Exhibit No. 1                99
13   Exhibit No. 2                99
14
15
16
17
18
19
20
21
22
23
24
```
                                                    3

```
 1   APPEARANCES:
 2
 3       MR. WILLIAM D. RILEY-EL
 4       Inmate No. B-03069
 5       Stateville Correctional Center
 6       P.O. Box 112
 7       Joliet, Illinois  60434
 8           Appeared Pro Se;
 9
10
11       OFFICE OF THE ATTORNEY GENERAL
12       BY:  MS. COLLEEN M. SHANNON
13       100 West Randolph Street
14       13th Floor
15       Chicago, Illinois  60601
16       (312) 814-4450
17       cshannon@atg.state.il.us
18           Representing the Defendants.
19
20
21
22
23
24
```
                                                    2

```
 1                (whereupon, the witness was duly
 2                      sworn.)
 3
 4              WILLIAM D. RILEY-EL,
 5   having been first duly sworn, was examined and
 6   testified as follows:
 7
 8       MS. SHANNON:  Can you please state
 9   your name and spell your last name for
10   the record?
11       THE WITNESS:  William D. Riley-El.
12       MS. SHANNON:  Please spell your last
13   name.
14       THE WITNESS:  R-i-l-e-y, hyphen, E-l.
15       MS. SHANNON:  And can you also state
16   your IDOC number?
17       THE WITNESS:  B-03069.
18       MS. SHANNON:  Let the record reflect
19   that this is the deposition of William D.
20   Riley-El taken pursuant to notice and
21   the applicable Federal Rules of Civil
22   Procedure.  It's in the case of
23   Riley-El vs. Godinez, et al., Case No.
24   15 CV 11180, which is currently pending
```
                                                    4

1   in the Northern District of Illinois,
2   Eastern Division.
3
4                    EXAMINATION
5   BY MS. SHANNON:
6       Q.   Sir, my name is Colleen Shannon
7   and I represent all of the IDOC defendants
8   that you are suing in this case.
9       A.   Okay.
10      Q.   Do you understand that your
11  testimony today would hold the same
12  weight as if you were testifying in
13  court?
14      A.   Yes.
15      Q.   Did you take any medications
16  this morning?
17      A.   Yes.
18      Q.   What did you take?
19      A.   I took high blood pressure meds.
20      Q.   Is that the only thing you took?
21      A.   Some Tylenol.
22      Q.   What is the Tylenol used to
23  treat?
24      A.   Well, I had a headache.  I had

                                              5

1       Q.   More than five?
2       A.   I'm not sure of that.  It's
3   about right there.  Around there.
4       Q.   Between one to five?
5       A.   Yes.
6       Q.   Was it for lawsuits that you
7   filed as a plaintiff?
8       A.   I believe so, yes.
9       Q.   Were they lawsuits filed against
10  the IDOC?
11      A.   In the Medical Department, yes.
12      Q.   All right.  So all of your
13  prior depositions were for cases when
14  you were incarcerated?
15      A.   Yes.
16      Q.   All right.  Do you recall the
17  nature of any of those cases?
18      A.   Condition of confinement and
19  medical.  And medical treatment.
20      Q.   Was that one case or two separate
21  ones?
22      A.   It was more than one.
23      Q.   So one was conditions and one
24  was a medical treatment case?

                                              7

1   allergies this morning.  Allergies at
2   5:00 something this morning.
3       Q.   Would the blood pressure
4   medicine or the Tylenol affect your
5   ability to testify today at all?
6       A.   Somewhat.  They had me drained.
7       Q.   Oh, just drained?
8       A.   Yeah.
9       Q.   But does it affect your memory
10  in any way?
11      A.   Yes.  That's why I brought all
12  the paperwork so I could run through it.
13      Q.   Well, do you feel that you're
14  able to go forward with this deposition
15  today?
16      A.   Yeah, I'm ready.
17      Q.   Okay.  Have you ever been deposed
18  before?
19      A.   Yes.
20      Q.   How many times?
21      A.   I'm not sure.  I'm not sure
22  of the number.
23      Q.   Was it more than one?
24      A.   Yes.

                                              6

1       A.   Or they was combined.
2       Q.   All right.  Well, let me run
3   through some quick rules then.  If you
4   don't understand any of the questions
5   I ask you or you don't hear me, please
6   let me know and I'll restate it or
7   rephrase it.
8       A.   Okay.
9       Q.   But if you answer I'm going
10  to assume that you understood it, okay?
11      A.   Yes.
12      Q.   And then please just remember
13  to give verbal answers so that the
14  court reporter can take down everything
15  you're saying, okay?
16      A.   Okay.
17      Q.   And then we'll try our best
18  to -- you know wait until I finish
19  asking the question before you answer
20  and then I'll wait until you're done
21  talking before I ask my next question.
22      A.   Okay.
23      Q.   So that way we are not talking
24  over each other, okay?  All right?

                                              8

**Page 9**

```
 1      A.   Yes.
 2      Q.   And then if at any time
 3   you need to take a break just let
 4   me know, okay?
 5      A.   Okay.
 6      Q.   As long as there's not a
 7   question pending, sir, that's totally
 8   fine.  But if there is a question
 9   pending, sir, I'll just have you
10   answer that and then we can stop,
11   all right?
12      A.   Yes.
13      Q.   Lastly, I know you have a lot
14   of documents here in front of you.
15      A.   That's correct.
16      Q.   And I'm sure some was produced
17   through discovery in this case, but
18   for the deposition that you are here
19   for today it's just going to be based
20   on what you remember.  Okay?
21      A.   Okay.
22      Q.   So if I ask you a question
23   I want to know like what you remember.
24   And if you don't remember the answer,
```

**Page 10**

```
 1   that's fine, you can just tell me
 2   that.
 3      A.   Okay.
 4      Q.   But it's just -- you know
 5   I can't be like sifting through all
 6   of your documents.
 7      A.   Why not?
 8      Q.   Because this is just --
 9      A.   See, look.  The reason why
10   I'm asking this is because I filed --
11   I filed numerous grievances.  It's
12   impossible for me to remember every
13   grievance word for word what I've
14   stated.  So I have to go to the
15   grievance on them particular dates
16   to state what they were.
17      Q.   So I do understand that,
18   but I will be asking you questions
19   just sort of general.  I'm not going
20   to be quizzing you on like what date
21   and what was said.  You're not required
22   to like perfectly restate everything
23   that you said in the past.  It's just
24   purely -- I just want to know as we
```

**Page 11**

```
 1   sit here today what do you remember.
 2   And if you don't remember certain
 3   things, well, just let me know that,
 4   okay?
 5      A.   Okay.  So the reason I'm
 6   asking is if I got to go specifically
 7   off of my memory -- uhh -- well, my
 8   memory is not that good.
 9      Q.   Okay.
10      A.   Just years -- that's just
11   years of being incarcerated and taking
12   medication.  That's why I have the
13   paperwork.  I wrote it when it was
14   fresh in my mind.  Once it's wrote,
15   and it's been years since I wrote it
16   you know, it's impossible for me to
17   remember everything like that.
18      Q.   Yes, but just try your best,
19   okay?  Because unless something that's
20   used as an exhibit and handed to you
21   you're supposed to just testify off
22   of your memory.  It's the same way
23   that you would do it in court, okay?
24   So it's just the best that you can
```

**Page 12**

```
 1   remember.  That's all I'm asking,
 2   okay?
 3      A.   Okay.  So I can't hand you
 4   exhibits that I got?
 5      Q.   No.  The way this works is
 6   I ask you questions and then if I
 7   have an exhibit I'll show that to
 8   you and then you could use the
 9   exhibit.  Otherwise, it's just based
10   off of whatever you can remember.  And
11   I'm not asking you to guess.  Just if
12   you can remember that's how you'll
13   answer, okay?
14      A.   All right.
15      Q.   All right.  So did you talk
16   to anyone to prepare for your deposition
17   today?
18      A.   No.
19      Q.   Did you review any documents to
20   prepare for today?
21      A.   No.
22      Q.   And you're currently incarcerated
23   in the Illinois Department of Corrections,
24   right?
```

| | |
|---|---|
| 1 A. Yes. | 1 A. To July. |
| 2 Q. Do you recall what your admission | 2 Q. To 2015? |
| 3 date is? | 3 A. Yeah. |
| 4 A. I think April 2nd of 2002. | 4 Q. And then when you were at |
| 5 Q. What is the crime that you're | 5 Stateville the previous time before |
| 6 convicted of? | 6 Pontiac, sir, what are the dates |
| 7 A. Murder. | 7 that you were there? |
| 8 Q. What was the sentence that you | 8 A. From '07. November '07. |
| 9 received? | 9 Q. Through June 2014? |
| 10 A. I got a commuted natural life | 10 A. Yeah. |
| 11 sentence. | 11 Q. Where were you prior to |
| 12 Q. You don't have a parole date? | 12 November of 2007? |
| 13 A. No. | 13 A. Month-and-a-half I was at |
| 14 Q. And you're currently incarcerated | 14 Pontiac. |
| 15 at Stateville Correctional Center? | 15 Q. And then where were you prior |
| 16 A. Yes. | 16 to that? |
| 17 Q. What cell house are you living | 17 A. Stateville. |
| 18 in right now? | 18 Q. Was that the first time you |
| 19 A. C-House. | 19 were at Stateville? |
| 20 Q. What's your cell number? | 20 A. Yeah. |
| 21 A. C-441. | 21 Q. Was it -- so from 2002? |
| 22 Q. C-441? | 22 A. '03. I was in Menard in 2002. |
| 23 A. Yes. | 23 Q. So Menard 2002 to 2003? |
| 24 Q. How long have you been at | 24 A. Yeah, January. |
| 13 | 15 |

| | |
|---|---|
| 1 Stateville? | 1 Q. And then Stateville 2003 until |
| 2 A. I've been back here since '15. | 2 what month? |
| 3 June of '15. July of '15. | 3 A. September '07. And I did |
| 4 Q. Prior to that, sir, what facility | 4 -- and I did two days in Menard. |
| 5 were you at? | 5 Q. When was that? |
| 6 A. Pontiac. | 6 A. 11/7 to 11/9 of '13. They |
| 7 Q. How long were you at Pontiac? | 7 tried to transfer me from Stateville |
| 8 A. 13 months. | 8 to Menard and they send me right |
| 9 Q. Where were -- | 9 back. Another -- well, that was the |
| 10 A. That was segregation. That | 10 retaliatory transfer. |
| 11 was segregation. AD, Administrative | 11 Q. Okay. Did we cover every |
| 12 Detention. It's for events that | 12 facility that you've been at since |
| 13 happened in this case right here. | 13 2002? |
| 14 Q. So where were you prior to | 14 A. Yes. |
| 15 Pontiac? | 15 Q. How long have you been living |
| 16 A. I was here at Stateville. | 16 in C-House, Cell 441? |
| 17 Q. Was that the first time you | 17 A. I believe October of '16. |
| 18 were at Stateville? | 18 Q. What cell were you living in |
| 19 A. No. | 19 prior to that? |
| 20 Q. Do you recall the month or | 20 A. I was in X-House. I'm being |
| 21 the year that you were at Pontiac for | 21 held in X-House, PC Unit. A PC Unit. |
| 22 the 13 months? | 22 I was being held over there in seg in |
| 23 A. I think June. June of '14. | 23 administrative status. |
| 24 Q. June 2014 through -- | 24 Q. How long were you in X-House? |
| 14 | 16 |

| | |
|---|---|
| 1  A.  From the time I came back | 1  A.  Yes. |
| 2  in '15 until then. | 2  Q.  -- that you received it? |
| 3  Q.  Did you have a cellmate? | 3  A.  Yes. |
| 4  A.  No. | 4  Q.  And you're familiar with |
| 5  Q.  Did you stay in the same cell | 5  the information contained inside the |
| 6  the whole time in X-House? | 6  Inmate Handbook? |
| 7  A.  No.  No, they bounced me | 7  A.  Yes. |
| 8  around on the same little wing.  A | 8  Q.  So the events alleged in |
| 9  wing that had five cells on it and | 9  the complaint, the case that you're |
| 10  a shower.  They put me in the second | 10  here giving your deposition for today, |
| 11  cell first, the third cell, the fourth | 11  everything took place at Stateville, |
| 12  cell, and then the fifth cell.  They | 12  correct? |
| 13  moved me all the way to the end.  They | 13  A.  Yes. |
| 14  put me next to the shower. | 14  Q.  Is this the only lawsuit that |
| 15  Q.  You never had a cellmate in any | 15  you have pending about retaliation claims |
| 16  cell? | 16  at Stateville? |
| 17  A.  No. | 17  A.  Yes.  I believe so, yes. |
| 18  Q.  Do you currently have a | 18  Q.  And what's the time period of |
| 19  cellmate? | 19  the allegations in this lawsuit? |
| 20  A.  Yes. | 20  A.  I'm saying the grievances -- |
| 21  Q.  What is his name? | 21  umm -- 6 months prior to me being |
| 22  A.  I don't know his name. | 22  put in AD, that led to me being put |
| 23  Q.  Do you know his nickname? | 23  in AD, and all the grievances I filed |
| 24  A.  No. | 24  prior to them snatching me up in |
| 17 | 19 |

| | |
|---|---|
| 1  Q.  Do you talk to him? | 1  11/7/13. |
| 2  A.  No. | 2  Q.  So you're saying this lawsuit |
| 3  Q.  How long has he been your | 3  is covering events from 6 months prior |
| 4  cellmate? | 4  to 11/7/13? |
| 5  A.  He just got here from Menard. | 5  A.  Yes. |
| 6  Q.  When did he get there? | 6  Q.  Through what date? |
| 7  A.  A couple of months. | 7  A.  11.  Not 11.  '15.  '15.  When |
| 8  Q.  Did you have a cellmate prior | 8  they wrote me the last ticket they held |
| 9  to him? | 9  me for another year.  That's while I was |
| 10  A.  Yeah. | 10  in X-House.  So it would be '15, 11. |
| 11  Q.  Do you know his name? | 11  Q.  November of 2015? |
| 12  A.  No. | 12  A.  Yeah. |
| 13  Q.  Do you know his nickname? | 13  Q.  Okay. |
| 14  A.  No.  I don't really socialize | 14  A.  No, October. |
| 15  like that.  I think everybody is so | 15  Q.  Who are the defendants that you |
| 16  busy. | 16  are suing in this case? |
| 17  Q.  What? | 17  A.  They're IDOC defendants. |
| 18  A.  I think everybody is so busy. | 18  Q.  Do you know any of the |
| 19  In fact with what I just went through. | 19  individual's names? |
| 20  Q.  When you first entered IDOC, | 20  A.  Warden Lemke and all the |
| 21  sir, did you receive an Inmate Handbook? | 21  individuals who signed off on the |
| 22  A.  Yeah. | 22  disciplinary reports.  The fabricated |
| 23  Q.  Did you have to sign something | 23  disciplinary reports. |
| 24  acknowledging -- | 24  Q.  As you sit here today, sir, do |
| 18 | 20 |

**Page 21**

```
 1   you recall any of their names?
 2       A.   Yeah, Lieutenant Best.
 3   Lieutenant Fredricks.  Lieutenant --
 4   I mean not lieutenant.  Major Fredricks.
 5   Major Fredricks.  Major Marshall.
 6   Major McGarvey.  Major Torry (phonetic).
 7   IA Officer Clements.  I think there's
 8   a Ms. Jannetta Bennett (phonetic), but
 9   I didn't sue her.  She was one of them
10   officers being sent off.  Let's see
11   who else.  There's more.  Without having
12   the tickets, you know, I don't remember
13   the rest of their names.
14       Q.   Okay.  That's fine.
15       A.   I'm naming them specifically
16   because they the major.  They supposed
17   to know the rules before they -- like
18   where they authorize and signoff on
19   the tickets.
20           Now the first ticket that I
21   received -- if you don't mind me
22   stating.  The first ticket that I
23   received it was beyond the timeframe
24   they authorized anyway.  You see what
```

**Page 22**

```
 1   I'm saying?  Breaking the rules by
 2   any means to make sure they hold
 3   me where they was holding me at.
 4           So the rules state they have
 5   8 days from the time the incident occurred
 6   to serve the ticket.  They authorized --
 7   if you look at the ticket they signed
 8   off on the ticket way beyond the 8 days
 9   intentionally.
10           My incident date was 11/7
11   and they signed off on the ticket
12   on the -- like 20 something.  The
13   20 something of November.  I'm like
14   wait a minute.  It was 11/7 and they
15   had until the 15th to serve me the
16   ticket.  They signed off on it after
17   the 15th.  Intentionally rolling this
18   ball down this arbitrary hill.  These
19   majors did this.  They what you call
20   -- umm -- colluded together to do
21   that.
22           Because the rules state
23   8 days.  If you look at the ticket.  You
24   know the dates on the ticket.  The first
```

**Page 23**

```
 1   ticket -- the one for 11/7 where it
 2   said I was a gang leader this and
 3   that.  It was intentionally done
 4   because they signed off on it beyond
 5   the 8 days when I got the ticket and
 6   I pointed it out.
 7           So when they come on the AD wing
 8   where they was holding me, oh, no, this
 9   ain't what that means.  I'm clearly
10   reading it.  I read the rules to them
11   as they were coming to my door to talk
12   to me when they was doing tours.  They
13   was coming through with the AD committee.
14   The same major.  Even Deputy Director
15   Gomez.  I even talked to him about
16   it.  These individuals just ignored
17   what I was saying as if I was wrong.
18           Then once I filed a grievance
19   and they went to the grievance officer
20   she immediately threw it out.  For the
21   past years they knew it was arbitrary.
22   They want to hold me and keep me away
23   from general population from helping
24   people do legal work.
```

**Page 24**

```
 1       Q.   How do you know that they
 2   knew it was arbitrary?
 3       A.   Because the rules.  Because
 4   the rules state that no disciplinary
 5   report shall convene no more than
 6   8 days from the commission of the
 7   offense.  It's clearly written.  It's
 8   clearly written in the 504 section.
 9   It's clearly there.  They know this
10   because they got procedural processes
11   they give you for due process.  They
12   know this.
13       Q.   But how do you know that
14   they --
15       A.   They are required to know.
16   They are required to know
17   20 Administrative Code.  This is
18   where I'm quoting this from.  This
19   is not no rule they made up.  This
20   is the rule that's quoted from the
21   730 Code of Corrections, which is
22   also -- which is where the
23   20 Administrative Code -- umm --
24   Illinois law is promulgated from.
```

**Page 25**

1    That's what I'm saying they supposed
2    to know because it's state law.
3        Q.   But my question is --
4    because you said that they knew the
5    ticket was arbitrary.  How do you
6    know that they knew it was arbitrary?
7        A.   Because they supposed to
8    follow their own rules.  IDOC officials
9    are required to follow their own rules.
10       Q.   But what makes the ticket
11   arbitrary?
12       A.   Because they didn't follow
13   their own rules.  They broke their
14   own rules to give me the ticket.  That's
15   what I'm trying to explain to you.  This
16   place is based off procedures.  Everything
17   is by procedures by law.  Now once you
18   don't follow procedure you breaking the
19   law.
20       Q.   But how do you know what these
21   individuals knew?
22       A.   Because they got multiple
23   years in IDOC.  They not new.  They
24   not cadets.  They have multiple years

**Page 26**

1    of experience in filing and writing
2    tickets knowing what the right
3    process is and what the wrong process
4    is.  They have years of experience of
5    this.  That's how they became a major.
6            Now majors are required to
7    make sure everybody up under them
8    follow all the rules and regulations
9    of their procedures.  That's the whole
10   key the procedures.  That's why they
11   do the training so they follow the
12   procedures correctly.
13       Q.   Okay.
14       A.   If they don't follow the
15   procedures correctly that means they're
16   doing it arbitrary.  That means they're
17   not following the law and they doing
18   what they want to.
19       Q.   But you don't know what is going
20   on inside their head?
21       A.   They -- no.  No, it's not
22   their head.  Their actions.  Their
23   actions show me that it's arbitrary.
24   That's what I'm trying to explain

**Page 27**

1    to you.  When they did it their
2    actions was arbitrary.  Even though
3    whatever is going on in their head,
4    how they was thinking, you know they
5    supposed to know the rules.  They
6    supposed to follow the rules.
7            Like I'm supposed to follow
8    rules.  If I don't follow rules they
9    say my actions are arbitrary and they
10   write me a disciplinary report because
11   I'm not following their rules.  Or
12   I'm not following the procedures that
13   they outlined for me to conduct my
14   character.
15       Q.   But you don't know whether
16   they thought it was a legitimate ticket
17   or not?
18       A.   No, I know specifically because
19   the rules state this.  That a major are
20   required to -- see, look.  Why I keep
21   bringing up the rules is because this
22   place is a stickler for rules.  The
23   Department of Corrections, you know,
24   everything is about rules.  If you don't

**Page 28**

1    follow the rules you are in violation
2    of the rules.  That's why I say that.
3    That's why I keep bringing up the
4    fact about the rules.
5            Now they supposed to know the
6    rules themselves because they are the
7    enforcement of the rules.  That's why
8    I'm saying they are the enforcement of
9    the rules.  So every inmate that's
10   around here, or convicted felon, or
11   offender is required to follow all
12   the rules that the COs are required
13   to enforce.
14           So procedural-wise they
15   supposed to follow all the rules.
16   They can't just make up rules as
17   they go.  That's why the
18   20 Administrative Code is set down
19   from the highest plain.  The CO,
20   which is the -- the chief administrative
21   officer, and he required to follow
22   all the rules and enforce them.  And,
23   you know, have the staff follow and
24   enforce them because it's precedent.

1    It's setup this way.
2          It's like paramilitary.  It's
3    not something that they can say, oh, I
4    didn't know because they supposed to
5    know.  That's the reason why they get
6    training.  They do what they call them
7    tests.  They do -- uhh -- some tests
8    to see if they know the procedures and
9    if they don't, you know, they send them
10   to training.
11       Q.   When these majors received
12   the disciplinary ticket and decided
13   whether to signoff on it you don't
14   know what was going on in their heads,
15   do you?
16       A.   No, but I know what the rules
17   say.
18       Q.   Okay.  I understand.
19       A.   Look.  Look, look, 504.
20       Q.   We're going to move on.
21       A.   It's a hearing investigator.
22   That's a procedure.  That's the major.
23   It has a procedure that says he supposed
24   -- what he supposed to do.

                                        29

1        A.   No, not offhand.  If you let
2    me go through the paperwork I could
3    probably find the names for you.
4        Q.   Do you know like what any of
5    the other cases are about?
6        A.   Conditions of confinement.  Denial
7    of medical treatment.
8        Q.   And those are currently pending?
9        A.   Right.  As a matter of fact,
10   I have a state claim too.  I have a
11   mandate in state court.
12       Q.   Do any of those other cases
13   involve claims for retaliation?
14       A.   No.
15       Q.   Are you in a gang currently?
16       A.   No.
17       Q.   Have you ever been in a gang?
18       A.   I plead the Fifth on that
19   one.
20       Q.   Are you aware if IDOC records
21   have you as a documented gang member?
22       A.   No, but they can say what they
23   want to.
24       Q.   But have you ever seen on any

                                        31

1        Q.   There's no -- so for this
2    deposition -- I'm sorry to cut you
3    off, but you got to -- there's got
4    to be a question pending, okay?
5        A.   Okay.
6        Q.   You can't just like start
7    talking.  You got to just answer the
8    questions, all right?
9        A.   All right.  That was part of
10   the answer.
11       Q.   Okay.  All right.
12            Do you have any other cases
13   currently pending against IDOC employees?
14       A.   Yes.
15       Q.   How many?
16       A.   I'm not for sure off of memory.
17       Q.   More than five?
18       A.   No, not pending.
19       Q.   More than one?
20       A.   Yeah.
21       Q.   Three?
22       A.   Maybe.
23       Q.   Do you recall the names of any
24   of them?

                                        30

1    IDOC records --
2        A.   Oh, no.
3        Q.   -- a gang affiliation?
4        A.   No.  They don't show you
5    that.  It's confidential for them.  They
6    don't let you see that type of stuff.
7    They write you a ticket and then they
8    accuse you of something.
9        Q.   Okay.
10       A.   But as far as documentation --
11   umm -- what they say how they came about
12   that, no, I've never seen that.
13       Q.   Have you ever seen
14   documentation that says that you're
15   affiliated with a particular gang?
16       A.   You mean like a disciplinary
17   report?
18       Q.   Anything.
19       A.   Yeah.
20       Q.   What gang do they say that
21   you're affiliated with?
22       A.   They gave me a disciplinary
23   report.
24       Q.   What gang do they say you're

                                        32

```
 1   affiliated with?
 2        A.   I don't remember.  I have to
 3   look on the ticket.
 4        Q.   Have you been housed in
 5   segregation at Stateville?
 6        A.   Yes.
 7        Q.   How many times?
 8        A.   Probably like five.
 9        Q.   Do you recall the reasons why
10   you were put in segregation?
11        A.   Most of the time it was
12   unauthorized property or something
13   like that.
14        Q.   How long were you held in
15   segregation?
16        A.   The most I was -- probably
17   it's because of the AD stuff.  Maybe
18   three months is the longest.
19        Q.   So that was prior to 2013?
20        A.   Yeah.
21        Q.   And then since 2013, sir, how
22   many times have you been in segregation?
23        A.   They give me two years back to
24   back.
                                          33
```

```
 1        Q.   What years were those?
 2        A.   '14 and '15.
 3        Q.   You were in segregation at
 4   Stateville from '14 to '15?
 5        A.   No.  No, I got transferred
 6   to Pontiac for a year and 13 months.
 7   That was -- that was one year.  Then
 8   I came back to Stateville and they
 9   wrote me another ticket when I came
10   back.
11        Q.   And you did a year in seg
12   that time?
13        A.   Yes, and being held in
14   X-House.  While F-House is open --
15   or X-House is open they put me in
16   X-House.  They told me I got too
17   much influence and they didn't want
18   me in F-House.  That's before F-House
19   got closed.  So they put me in
20   X-House.  They held me on the PC
21   wing.  Not a PC wing, but a PC kickout
22   wing.
23        Q.   Did you get out of seg in
24   October of 2016 when you moved to
                                          34
```

```
 1   C-House?
 2        A.   Yes.
 3        Q.   And you haven't been back in
 4   segregation since?
 5        A.   No, not at all.  I don't
 6   even do seg.  That three years they
 7   got out of me was -- was the first
 8   time I ever did, but I never -- I'm
 9   not a seg individual.  I don't even
10   catch tickets like that.
11        Q.   Okay.  Have you ever been
12   disciplined at the IDOC?
13        A.   Seg is discipline.
14        Q.   Have you ever been disciplined
15   for lying?
16        A.   No.
17        Q.   Have you ever been disciplined
18   for any other offenses of dishonesty?
19        A.   Not that I know of.  You
20   talking about like giving false
21   information to an employee, stuff
22   like that?
23        Q.   Yes.
24        A.   Never.
                                          35
```

```
 1        Q.   Okay.  I want to go through and
 2   ask you about some of the defendants that
 3   you're suing in this case.  You mentioned
 4   Charles Best earlier.
 5        A.   Yes.
 6        Q.   Why is he a defendant in this
 7   case?
 8        A.   He's a lieutenant.  He's a
 9   lieutenant that found me guilty
10   arbitrarily.
11        Q.   What did he find you guilty
12   of?
13        A.   STG.  Erratic organizational
14   activity.
15        Q.   What was the date of that guilty
16   finding?
17        A.   I don't know the date, but
18   I know the ticket that he found me
19   guilty on.  It don't state date, time,
20   or place when I committed the offense.
21        Q.   Do you recall the year of the
22   ticket?
23        A.   That's the one -- that's the
24   one in '14.
                                          36
```

| | |
|---|---|
| 1 | Q. 2014? |
| 2 | A. 2014. |
| 3 | Q. Okay. |
| 4 | A. That ticket. He the one that |
| 5 | presided over that. As a matter of |
| 6 | fact, this is how they held me for |
| 7 | the ticket. I was in the infirmary. |
| 8 | I just got a fistula in my arm. I'm |
| 9 | bedridden. They wrote me a ticket. They |
| 10 | came to my cell and held the hearing |
| 11 | in my cell. My hospital bed cell. They |
| 12 | held the hearing in there. |
| 13 | So now 20 minutes later the |
| 14 | police at the door telling me to pack |
| 15 | it up and I'm being transferred. So |
| 16 | all this was prearranged. Who do |
| 17 | you know get found guilty and then |
| 18 | 20 minutes later they say you being |
| 19 | transferred to Pontiac? |
| 20 | Q. Did you provide a statement |
| 21 | at that hearing? |
| 22 | A. Yes, I did. |
| 23 | Q. Was it written or verbal? |
| 24 | A. I read my grievance that I |

37

| | |
|---|---|
| 1 | wrote to him and asked him could I |
| 2 | turn it in. He refused to take the |
| 3 | grievance. He refused to take the |
| 4 | grievance, but he let me read it. |
| 5 | Q. Why do you believe that |
| 6 | Lieutenant Best retaliated against |
| 7 | you? |
| 8 | A. Because lieutenant -- from |
| 9 | my perspective, right, I got a long |
| 10 | history. I have a long history with |
| 11 | Lieutenant Best. Lieutenant Best |
| 12 | used to be the movement officer for |
| 13 | the facility. |
| 14 | In 2010 we had a warden |
| 15 | named Warden Hardy who stated that |
| 16 | individuals with crutches couldn't |
| 17 | go to the yard. I was the individual |
| 18 | who constantly wrote the grievances |
| 19 | up about not being able to go to the |
| 20 | yard and not being treated equally |
| 21 | or fairly by staff. Because when |
| 22 | they was giving us the yard it |
| 23 | was -- they was only giving us the |
| 24 | small yard when everybody else is |

38

| | |
|---|---|
| 1 | rotated. |
| 2 | And, specifically, I got |
| 3 | into an altercation with Best. Because |
| 4 | one day I asked him why he don't |
| 5 | rotate us like everybody else, like |
| 6 | we supposed to. We supposed to be |
| 7 | treated equally, but they wasn't |
| 8 | treating us equally. They only |
| 9 | giving us small yard, no weights, |
| 10 | no phone call, no nothing. They |
| 11 | always keeping us out there in the |
| 12 | freezing cold in the wintertime. No |
| 13 | gym, no nothing. |
| 14 | So I asked him, I said why |
| 15 | we not being allowed to go to the |
| 16 | south yard where the weights and |
| 17 | the phones is at? He said, oh, we |
| 18 | got to use that for movement, but |
| 19 | that's on Sunday. But on Saturday |
| 20 | they put the detail yard out there |
| 21 | and they walk through the tunnel. |
| 22 | The line from the tunnel. So I said, |
| 23 | why you can't move the line through |
| 24 | the tunnel like you do on Saturday? |

39

| | |
|---|---|
| 1 | He told me because we don't want to |
| 2 | and we going to do it that way. |
| 3 | So when I saw the major, |
| 4 | which is Major McGarvey, I asked |
| 5 | why we can't get the rotation like |
| 6 | everybody else. He stated out of |
| 7 | his mouth ain't fittin to let no |
| 8 | inmate tell me how to do my job. |
| 9 | Now this is prior. This is prior |
| 10 | to me going to that hearing. So |
| 11 | he had personal issues with me from |
| 12 | then. |
| 13 | Q. But how do you know the hearing |
| 14 | decision was done in retaliation? |
| 15 | A. Because I -- I can show you |
| 16 | the ticket. If you read the ticket, |
| 17 | right, the ticket does not state a |
| 18 | time, place, or date when I committed |
| 19 | the offense. It don't state that, |
| 20 | which is required by the procedures. |
| 21 | Now that's why I keep saying |
| 22 | that this stuff is retaliation. Because |
| 23 | no matter what I would have said, no |
| 24 | matter what I did, I'm on my hospital |

40

**Page 41**

1 bed and they still found me guilty.
2 I was in the hospital secluded. I
3 was in AD already secluded and talking
4 to nobody and not having no activities
5 with nobody and they still wrote
6 me another gang ticket. That's
7 what I'm trying to explain to you.
8         This is not something where
9 I got out of seg and I went and talking
10 to any more people, and then they
11 came with another ticket. No. No.
12         I was in AD from 11/7/13 until
13 when I got out of seg in '16. They
14 wrote the ticket in between there when
15 I was already in AD custody. AD custody
16 mean that everywhere I go a lieutenant
17 or a sergeant has to move me. I'm
18 shackled up moving. I don't -- I
19 didn't have a celly so I have no
20 communication with nobody. So if
21 there are no communication how am
22 I engaged in gang activity, right?
23     Q.  So was Lieutenant Best aware
24 of the grievances you were filing prior

**Page 42**

1 to June 2014?
2     A.  Yes.
3     Q.  How do you know?
4     A.  Because when they get your
5 grievance and it's against one of
6 them they go ask them about it. When
7 the counselor investigate and they
8 give a response they say staff said
9 blah, blah, blah, blah to your
10 grievance. The counselor go investigate
11 and talk to the staff member. They
12 can't give a response to your grievance
13 if it's against staff members without
14 them going to talk to the staff member.
15     Q.  Do you know whether your
16 counselor actually spoke to Lieutenant Best
17 though?
18     A.  The counselor said -- that's
19 what the counselor stated.
20     Q.  Did you see them speaking?
21     A.  No. You never see them speaking,
22 but the counselor gives his response. The
23 counselor gives a response on the bottom
24 of the grievance. So that's another

**Page 43**

1 staff member's word saying what he did
2 or what staff said to him. That's the
3 only thing we ever get.
4     Q.  Okay.
5     A.  We don't get no personal
6 conference meeting with them and he
7 sit down and talk like this. It's
8 about one staff member said this and
9 this staff member said that. Blah,
10 blah, blah, so forth and so forth.
11     Q.  Did you ever send any grievances
12 directly to Lieutenant Best?
13     A.  No, that's not the procedure.
14     Q.  Okay. What about Joshua Clements,
15 why are you suing him?
16     A.  Because he the IA officer. He
17 the IA officer that cosigned for the other
18 IA officer as a witness.
19     Q.  Why do you believe he retaliated
20 against you?
21     A.  Because -- let me see what
22 year was it in. In probably like
23 December '08 or '09 he got beat up.
24 The rumors was that I had something

**Page 44**

1 to do with it and I had it done, but
2 it wasn't me. I had nothing to do
3 with it, but that was the rumor. Ever
4 since then he's been, I guess, figuring
5 a way to get me.
6     Q.  And Clements is spelled
7 C-l-e-m-e-n-t-s.
8     A.  He was the movement officer
9 then. I was -- as a matter of fact,
10 you know, it was in '07 and '08 when
11 that happened. It had to be between
12 that time.
13     Q.  Okay.
14     A.  As a matter of fact, that's
15 when I got shipped to Pontiac the first
16 time for the little month-and-a-half.
17 Because the ticket said possibly alleged
18 in gang activity. It was an investigation
19 ticket, but I left for a month-and-a-half
20 and came back.
21     Q.  So what specifically did
22 Clements do that you believe was done
23 in retaliation?
24     A.  He signed off on the tickets.



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

41..44

**Page 45**

```
1    The ticket that was wrote that don't
2    state the time, place, or date when
3    I committed the offense.
4        Q.   How do you know that it was
5    retaliation by him signing the ticket?
6        A.   Because that's his way of
7    trying to get back at me.  Because
8    he did it again.  He did it twice.
9    He ain't just do it once, but he
10   did it twice.
11           He signed off on the first
12   ticket and then he came back.  When
13   I came back and was fittin to get
14   out of seg, or they was going to
15   release me out of AD, and they wrote
16   me another ticket.
17       Q.   You are assuming like he was
18   trying to get back at you because you
19   heard the rumors about how he blamed
20   you for the attack?
21       A.   No.  No, I heard the staff
22   saying it.  It wasn't an inmate, but
23   it was staff saying it.  The staff.
24       Q.   So then you assumed based
```

**Page 46**

```
1    on that that Clements might be trying
2    to get back at you?
3        A.   Yes.  But it actually showed
4    me that because -- uhh -- I hadn't broken
5    no rule.  I hadn't done nothing.
6            When they come and write me
7    an arbitrary ticket out of the blue.
8    It don't state when I supposed to
9    have committed the offense on there,
10   on the ticket.  All it states is the
11   time he said when he discovered the
12   information.  And so it's called a
13   confidential source.  They stated
14   whatever they stated.  It don't
15   state when I supposed to have gave
16   this order, where, when, how.  Because
17   it's impossible for him to state that
18   because I was always in AD custody.  But
19   guess what, they still found me guilty
20   and gave me a year for it.
21       Q.   Do you know whether Clements
22   was aware of these rumors that you were
23   behind the attack on him?
24       A.   No.  No, I'm not.  I'm not
```

**Page 47**

```
1    aware.
2        Q.   Okay.
3        A.   But the way that the officers
4    is gossiping, you know, that's where he
5    got it from.
6        Q.   Okay.  What about Theodore Fredricks?
7    Why are you suing him in this
8    case?
9        A.   Because he was the movement
10   officer first before Best.
11       Q.   The movement officer?
12       A.   Yeah, before he became a major
13   he was the movement officer first.  He
14   lost his job because he refused to rotate
15   us first.
16       Q.   And what did he do that was
17   -- that you believe was in retaliation?
18       A.   He signed off.  He signed off
19   on the ticket.  The timeframe.
20       Q.   Was it the ticket from June of
21   2014?
22       A.   I'm not sure.  It's the one --
23   the first two.  It could have been the
24   first ticket.
```

**Page 48**

```
1        Q.   And how do you know that him
2    signing this ticket was done in
3    retaliation?
4        A.   Because he broke procedure.
5    By him being a major he supposed to
6    know all the procedures and be a
7    safeguard for the procedures.  Because
8    if it's not done right he's supposed to
9    tell him to rewrite it.
10       Q.   But what was he retaliating
11   against you for?
12       A.   The crutch yard.  The crutch
13   yard.  Because I wrote a lot of people
14   up and got a lot of people reassigned.
15       Q.   Did Fredricks know that you
16   were helping people with their crutch
17   yard grievances?
18       A.   Yeah, I wrote it up.  I told
19   them.  They knew I was writing it up.
20   I was filing emergency grievances
21   directly to the warden complaining
22   specifically about Fredricks and about
23   not rotating us.  I put his name in
24   the grievance.
```

1    Q.    How do you know that Fredricks
2    knew about that grievance though?
3        A.    Because like I said before,
4    when you file grievances and whatever
5    staff members you name in the grievance,
6    the counselor or the grievance officer
7    has to investigate it.
8        Q.    I understand that's the
9    process.
10       A.    That's the only way I know.
11   Because they -- they follow-up with
12   what their staff said that from now
13   on you all will be getting rotated.
14       Q.    So you're assuming that
15   that process was followed and that
16   Fredricks was informed of the
17   grievances, but do you know whether
18   he was actually interviewed by the
19   counselor?
20       A.    All I know is the counselor
21   said they talk to staff.  Talked to
22   all the staff members involved.
23       Q.    What about Jill Hosselton?  Why
24   are you suing that individual?

49

1        A.    She sat on the
2    Adjustment Committee.  She sat on
3    the Adjustment Committee for the
4    last ticket.
5        Q.    H-o-s-s-e-l-t-o-n.  F-r-e-d-r-i-c-k-s.
6             would that have been the
7    October 2015 ticket?
8        A.    Yes.
9        Q.    And what did she do that you
10   believed was in retaliation?
11       A.    She cosigned.  She cosigned the
12   ticket.
13       Q.    What was she retaliating against
14   you for?
15       A.    I really -- I really don't have
16   nothing against her.
17       Q.    So is she a defendant in
18   this case based on signing off on
19   the Adjustment Committee hearing?
20       A.    Yeah.  Yes.
21       Q.    Okay.
22       A.    It's called -- uhh -- uhh --
23   conspiring with the other individuals.
24       Q.    Okay.  Nicholas Lamb, why are

50

1    you suing him?
2        A.    Oh, he the warden.  He signed
3    off on it.  He supposed to do the
4    appeal for grievances.  So when you
5    appeal to him and you stress on
6    your -- your due process issues to
7    him he supposed to go an overview.
8    He supposed to correct.
9        Q.    Did he retaliate against you?
10       A.    I believe so.
11       Q.    Why?
12       A.    Because when I was in AD.  When
13   I was in AD I used to have arguments with
14   him.
15       Q.    And that was in 2013?
16       A.    Yes.  When I first got put
17   in there he's the assistant warden.
18   He was the assistant warden then
19   and he used to come around with the
20   committee.  I used to have arguments
21   with him about them not restraining
22   their staff from writing me arbitrary
23   tickets.  Like the first ticket.
24             Like I said, I was talking

51

1    to him at the door and I'm reading
2    the rules to him.  See, there's one
3    thing I realize.  Once I went through
4    that -- umm -- staff members, correctional
5    officers, you know don't like an inmate
6    pointing out when other staff members
7    have done something wrong or that I'm
8    trying to tell them how to do their
9    job.  They take that really offensively
10   and strike back.
11       Q.    But when did Lamb do anything
12   that you believe was in retaliation?
13       A.    When I talked to him prior
14   to my grievance getting to him.
15       Q.    When was that?
16       A.    When they used to do rounds on
17   the AD wing in '13.
18       Q.    So the last time that Lamb
19   did anything that you believe was out
20   of retaliation that was in 2013?
21       A.    No.  No, no, no.  That's
22   when I first talked to him and gave
23   him the reason to be retaliatory
24   towards me.

52

**Page 53**

1    Q.  So then when was he actually
2 acting out of retaliation towards you?
3    A.  Once he became active.  He was
4 head warden.
5    Q.  When was that?
6    A.  I believe in '15 when I came
7 back here.
8    Q.  Okay.
9    A.  Because the last ticket --
10 the last ticket he was the acting
11 warden.  And when I grieved that
12 process to him he just denied me
13 and gave me no reason, no nothing.
14    Q.  So was it his denial of your
15 grievance that you believe was the
16 retaliatory act?
17    A.  Yeah.  Yeah, after my
18 conversations with him in '13 about
19 -- the whole thing was this.  They
20 wanted me isolated.  Not because I
21 was a danger, but because of my writ
22 writing ability helping people file
23 grievances and lawsuits.  That was
24 the purpose.  Nothing about me being

**Page 54**

1 a gang leader.
2        Because I was just working
3 in the law library and I was doing
4 my job.  The problem was that I did
5 my job too good.  Because if a person
6 come to me with a problem and say,
7 well, how do I resolve this, how
8 do I resolve it, and I tell them
9 how they do it and they get results.
10 That's not gang activity.  It's
11 me showing a person how to enforce
12 their Constitutional rights.
13        But for staff members they
14 like, no, that's a problem.  Because
15 now they're getting overworked, the
16 counseling staff getting overworked,
17 and they have to respond to these
18 Constitutional violations.  That's
19 the real issue here.  It has nothing
20 to do with me being a gang member.
21    Q.  Okay.
22    A.  Because if I was a gang member
23 I would have never had the job in the
24 first place.  But my ability to help

**Page 55**

1 people file grievances and do lawsuit
2 writ writing that was the issue.  They
3 knew that I was a writ writer.
4    Q.  So you believed that these
5 individuals retaliated against you
6 for helping others with their
7 grievances?
8    A.  Yes.
9    Q.  Do you know --
10    A.  Filing lawsuits.  Me filing
11 lawsuits.
12    Q.  How do you know that any
13 of the defendants named in this
14 lawsuit were aware of the grievances
15 you helped others file?
16    A.  Because I was going on writs.
17 Medical writs.  The writ officers would
18 tell me, yeah, we been hearing about
19 you.  You got a lot of paperwork flowing.
20        Now they not even in the
21 institution.  They do writs everyday
22 and they leave.  So they take me out
23 on a writ and while I'm at UIC in the
24 holding bin at UIC, downstairs where

**Page 56**

1 they hold the inmates at, the officers
2 is talking like, yeah, we heard about
3 you Riley.  You do a whole lot of
4 writing.  That's how I know for sure
5 that it's spreading around.
6    Q.  Okay.
7    A.  Now I can't specifically say
8 who knows what, but I know that they
9 talking because these writ officers
10 not in my cell house or in the
11 institution.  They do writs everyday.
12 They talk to the people up front I
13 guess.  That's the only thing I can
14 assume.  Because I never wrote up
15 none of the officers that was on
16 writs.  I never wrote them up.
17    Q.  What timeframe was this
18 when you were talking to the writ
19 officers?
20    A.  In '13.  In '13.
21    Q.  Why are you suing Kevin Laske
22 in this case?
23    A.  He a major.  He was one of the
24 main ones that signed off on the ticket

**Page 57**

1  too.

2  Q.  What ticket was that?

3  A.  I believe a couple of them.
4  See the two things with this there's
5  two majors that signoff on them before
6  they get processed.  It go to the major
7  first for the major to decide whether
8  this is going to be a minor or a major,
9  which is the hearing officer.  He the
10  one who determines whether the ticket
11  is a major or a minor.  He the one
12  that's supposed to do the safeguard
13  in the initial process to see if the
14  ticket will hold muster.  That's what
15  I mean by procedures.  Now that's his
16  job to do that.

17  Now if he -- if he authorize
18  the ticket and he know it's beyond the
19  timeframe he'll say skip the procedures,
20  we going to push this through anyway,
21  and that's now how this go.

22  Q.  But how do you know that that
23  was done in retaliation?

24  A.  Because of who I was.  Because

**Page 58**

1  of who I was and what my situation was.
2  I'm the individual that's writing the
3  grievances.

4  Like I told you in 2010, I'm
5  the individual that got the warden
6  to change that policy.  They stopped
7  us from having yard from August to
8  October, but the only reason why they
9  did that is because of all the grievances
10  I filed.  I filed a grievance every time
11  they didn't let me go to yard.  They ran
12  yard two or three times a week.  So two
13  or three times a week I was constantly
14  writing emergency grievances  complaining
15  about not being able to go to yard.

16  Q.  Was Laske aware of those?

17  A.  Yes.

18  Q.  How do you know?

19  A.  Because he was here.  He was
20  shift commander.

21  Q.  Did you submit the grievances to
22  him?

23  A.  No.  No, no, no, they don't go to
24  him.

**Page 59**

1  Q.  So you're assuming he was
2  aware of them just based on his position
3  as shift commander?

4  A.  No, the shift commander controls
5  the movement.  He the one that assign
6  the officers to the assignments.  Who
7  going to do this, who going to do that,
8  who going to do that.

9  So if there's a problem on
10  his shift where an individual is not
11  doing their job they would be made
12  aware of it.  Because he the one who
13  has to correct it.

14  Now he has to correct the
15  issue because he got a staff member
16  on his staff who he appointed to be
17  in that position and they're not doing
18  their job correctly.  He is the one
19  that has to remove them.

20  Q.  But do you know whether he
21  has actual knowledge of these grievances
22  that you were writing?

23  A.  I'm pretty sure he did.

24  Q.  Okay.

**Page 60**

1  A.  Because I sent them straight
2  to the warden and it comes -- and it
3  comes down here.

4  Q.  Well --

5  A.  The reason I say that is this.
6  They made changes.  Somebody had to know.
7  Somebody had to know that these grievances
8  was taking effect because they changed
9  the movement officer.

10  Q.  Sure, but do you know
11  specifically as to Laske if he knew
12  about your grievances?

13  A.  I can't -- I can't say that
14  specifically, but the way this place
15  is ran it's impossible for him not to
16  know because they going to take it
17  to him.  Because he's the one who is
18  appointing the movement officer, this
19  and that.  He does the assignments for
20  the staff members when they come in
21  at roll call.

22  Q.  Right, but you're making that
23  assumption though.

24  A.  I'm making the assumption

**Page 61**

1   because the procedure and how this
2   place works.  See, it works this way.
3       Q.   Okay.
4       A.   There won't be no changes
5   without the major being involved if
6   he the shift commander.  That's why
7   I'm saying this.  The shift commander
8   runs the ship.  He appoints and he
9   take away positions.
10      Q.   What about David Mansfield, why
11  are you suing him?
12      A.   Because he collaborated the
13  ticket too.
14      Q.   He signed off on the ticket?
15      A.   Yeah, he did.  He part of
16  the Adjustment Committee with Best.
17      Q.   How did he act out of
18  retaliation?
19      A.   He like Jill.
20      Q.   So did Mansfield retaliate against
21  you for anything?
22      A.   Not per se.  I wrote -- the
23  collusion with Best, so that's why he
24  got sued.

**Page 62**

1       Q.   What about --
2       A.   He upholding.  He upholding
3   the actions of Best.  Best's actions
4   are retaliatory and he upholding
5   them with him instead of speaking
6   out.
7            Because, like I told you, that
8   ticket that they wrote me -- well, if
9   you read it, the June 14th ticket.  If
10  you read it per se all the way through
11  and ask yourself, well, when did they
12  say Mr. Riley committed that offense?
13  They don't state that.  All it states
14  is when they became aware of it and
15  what the confidential source told
16  them.  That's all the ticket states.
17  But the confidential source never
18  states the date I supposed to have
19  committed it on, these offenses, nor
20  does the ticket state that.  This is
21  the ticket that Mansfield colluded
22  with Best when Best found me guilty.
23  Instead of telling him no, you know,
24  I don't see where it say he did

**Page 63**

1   that.
2       Q.   But did Mansfield act out
3   of retaliation or did he just simply
4   signoff on the ticket?
5       A.   He signed off on the ticket.
6       Q.   So he didn't do anything that
7   was in retaliation towards you?
8       A.   No.
9       Q.   What about Cherry Marshall, why
10  are you suing her?
11      A.   She a major.
12      Q.   What did she do that was retaliatory
13  towards you?
14      A.   The tickets.  The tickets.
15      Q.   Signed off on the ticket?
16      A.   No, she authorized the ticket.
17  She a major.  She the hearing investigator.
18  She didn't follow procedure.
19      Q.   C-h-e-r-r-y.
20           M-a-r-s-h-a-l-l.
21           M-a-n-s-f-i-e-l-d.
22           When Cherry Marshall signed off
23  on the ticket how do you know that was done
24  in retaliation?

**Page 64**

1       A.   All the stuff I had going on
2   already.  I'm obviously -- look, at
3   that time right there in '15, right,
4   I'm the only individual here that
5   they claiming this here in AD status,
6   Administrative Detention, out of the
7   whole penitentiary.  The reason why
8   I'm not in segregation housing units
9   is because they say I got too much
10  influence, but the influence ain't
11  gang activity.  The influence is
12  the writ writing ability.
13      Q.   Okay.
14      A.   Like do you see the crack on
15  the wall right there?  Do you see the
16  peeling paint?  The way this place
17  look and this type of stuff I'm writing
18  up because I got to live here.  If that
19  crack has lead or mold in it it's affecting
20  me.  So all this type of stuff I'm writing
21  up and that's a problem to staff.
22           Now staff look at me as if
23  I'm an irritant.  All I'm trying to
24  do is live and raise my life expectancy.

```
 1   Because at the time I was sick prior to
 2   me going to the allergist. I'm sick.
 3   And, you know, I'm saying that this place
 4   is making me even sicker. It has nothing
 5   to do with me being a gang member. I've
 6   been on a crutch since 2000. I've been
 7   on a crutch at Stateville since 2003.
 8        Q.   But I'm asking, sir, what
 9   did Cherry Marshall know about the
10   grievances that you were writing at
11   Stateville?
12        A.   I'm pretty sure she did.
13        Q.   How do you know?
14        A.   Like I said, the staff was
15   already gossiping.
16        Q.   Was Cherry Marshall gossiping?
17        A.   I never heard her gossip.
18        Q.   Okay.
19        A.   But what I'm saying to you
20   is they do -- they have meetings. The
21   majors have meetings and the lieutenants
22   have meetings. Do you see what I'm
23   saying? And when stuff is going on
24   in the institution per se they have
```
                                                65

```
 1   meetings about it.
 2        Q.   Are you present at the meetings?
 3        A.   No. No, I was never present,
 4   but I know this for a fact because I've
 5   been here for a long time.
 6        Q.   So you can't say for sure
 7   whether Cherry Marshall was aware of
 8   any of your grievances?
 9        A.   Well, if she was doing -- if
10   she was doing -- uhh -- that continuous
11   quality -- uhh -- improvement, meaning
12   in the health care, I could say she was
13   aware of my grievances. Because I was
14   also filing medical grievances per se
15   about my medical treatment. That's how
16   it all started.
17        Q.   Okay.
18        A.   I filed medical grievances
19   first. They was stalling me. So I
20   filed an emergency grievance. One in
21   June, one in July, and one in August.
22   By October I had filed three lawsuits
23   off of them three grievances. They
24   wasn't expecting that.
```
                                                66

```
 1        I want to try to explain to
 2   you about the -- about my writ writing
 3   ability. I filed three lawsuits in
 4   October of '13. Right after that --
 5   umm -- when he came with the gang leader
 6   stuff. The AD stuff.
 7        Q.   Did Cherry Marshall know about
 8   these lawsuits you filed?
 9        A.   I can't say for sure, but I
10   believe so. They have meetings about
11   stuff like that.
12        Q.   So you're assuming she knew,
13   but you don't know for sure?
14        A.   Yes. Yeah. Because the
15   reason why I'm suing -- umm -- it's
16   fair for me to assume because of the
17   way they signed off on these tickets.
18   Here's a person who goes from never
19   catching tickets to they give me
20   tickets back to back to back to back
21   and give me years in seg.
22        Now I never did a year. I've
23   never done a year in seg before in my
24   life until they did that in '13 to me.
```
                                                67

```
 1   I've never been in seg that long. Never.
 2   Most ever been in seg was a month, two,
 3   or three at the most. I've never did a
 4   whole year in seg until they arbitrarily
 5   did that to me right there.
 6        Q.   Why are you suing Jenny McGarvey?
 7        A.   Because she was a major too and
 8   she was simply personally involved in the
 9   day-to-day activities of the AD wing. I
10   talked to her on multiple occasions.
11        Q.   What did she do that was done
12   in retaliation?
13        A.   She made sure. She signed one
14   of the tickets too. She made sure. She
15   signed off on the first ticket.
16        Q.   So the only thing she did
17   that you're claiming is what's a
18   retaliatory act was signing off on
19   the ticket?
20        A.   No. No, no, no, no. That
21   lady -- that lady had some type of
22   personal agenda with me. Pushing
23   their agenda.
24        When I was in D-House, Delta House,
```
                                                68

**69**

```
1    in '13 before I even -- well, long before
2    '13. I was coming down the walk going to
3    the health care and she was coming toward
4    us. She was like, I don't know what you're
5    smiling for. You're lucky you ain't be
6    shipped with the rest of the homies. I'm
7    like, what are you talking about? I ain't
8    done nothing. She said, yeah, you lucky.
9    You lucky you ain't get shipped.
10          What happened was prior. Prior
11   to that date. A couple days before that
12   they round up a bunch of people and
13   shipped them. She telling me that I'm
14   lucky I hadn't gotten shipped with them.
15   I was like, what are you talking about?
16          Prior to the '13, 11/13,
17   the 11/7 stuff happened. So I was
18   like why she tripping on me like
19   that, you know? I didn't know what
20   it was, but I come to find out. I
21   come to find out that she had a
22   specific agenda about me. She wanted
23   me in AD.
24      Q.   Jenny McGarvey, M-c-G-a-r-v-e-y.
```

**70**

```
1       A.  She wasn't hiding nothing. She
2    told me blankly to my face that this
3    is what it is. Then she used to come
4    talk to us on the wing. She was the
5    major of the wing when they had it at
6    Stateville, the AD wing.
7           I got another quote stating
8    that there is no procedures. There's
9    no rule authorizing them to put us in
10   AD with the phase stuff and until
11   you -- and when you all take us to
12   court we ain't changing that. And I
13   got affidavits. I got affidavits
14   from another individual that heard
15   her state this. State this to me.
16      Q.   Why are you suing Michael Range?
17      A.   Because he was the hearing
18   investigator.
19      Q.   What did he do that was retaliatory
20   towards you?
21      A.   Well, I talked to him. I
22   talked to him in '13 about that same
23   ticket. The same ticket that I got
24   expunged. I talked to him and he
```

**71**

```
1    intentionally went back and told
2    his staff to rewrite the ticket.
3       Q.   How do you know?
4       A.   Because he told me he did. He
5    the hearing investigator. The first
6    ticket. The first ticket they wrote
7    me it just stated Riley. They told me
8    no and to go back and rewrite it. He
9    rewrote it. It was the 11/7 date on it.
10   Then went to 12/9. That 12/9 ticket
11   he told them to rewrite it and add
12   big wheel to it.
13      Q.   How do you know that that was
14   done out of retaliation?
15      A.   After I talked to him. I talked
16   to him at the door and explained. I
17   asked him about the rules and the
18   dates. Do you see what I'm saying
19   and about the timeframe? He like oh,
20   no, no, no, no. That's not how that
21   go.
22          Now this is what he said to me,
23   another individual. Another individual
24   they're supposed to know the rules and
```

**72**

```
1    regulations and enforce them and have
2    staff correct their ticket if there's
3    any mistakes in it.
4           Now the same individual that
5    I talked to, because of what he told
6    me. Well, he told me to my face the
7    reason they mess with you is because
8    they feel that you are bullying them
9    with their own rules. This is what
10   Range told me out of his mouth and
11   to my face. He specifically told me
12   this.
13          So he telling me because of
14   my intellectual -- my intellectual
15   thinking and prowess. That's the problem
16   they have with me is because I'm getting
17   out of all of the twists and turns they
18   try to put me in.
19          Like grievance process. If you
20   file a grievance they'll make you wait a
21   year before they answer you. So what I
22   started doing was filing an emergency
23   grievance directly to the warden. Once
24   I file directly to the warden I don't
```

**Page 73**

1  got to go through the other process
2  of waiting for months to months to
3  months to have an answer. Because
4  once he signoff on it that's your
5  answer as far as exhaustion purposes.
6  And when I started doing that it got
7  around the loophole where they stalling
8  you out on grievances. And, yeah, he
9  knew this.
10     Q.    So how did Range retaliate against
11 you?
12     A.    Like I said, when I talked to
13 him and asked him about the timeframe
14 he intentionally wrote and had them
15 rewrite the ticket after I talked to
16 him about it. It's not like I -- I
17 talked to him and had a long conversation
18 with him, argued with him, about the
19 procedure. So he said -- what he
20 did was -- I know what to do for
21 him since he fittin to get out. You
22 can just rewrite it and make sure he
23 don't get out of it.
24     Q.    Range. R-a-n-g-e.

**Page 74**

1           Now what about Joel Shaw. J-o-e-l.
2  S-h-a-w. Why are you suing him?
3     A.    IA officer. He the one -- he
4  was one of the ones that initiated the
5  whole thing about me being a gang member.
6  Or a gang leader. Not just a member, but
7  a leader.
8     Q.    And why do you believe that that
9  was done out of retaliation?
10    A.    Oh, this guy. When I was in
11 -- when I was in the health care I was
12 in AD. Now I already had the ticket
13 expunged, but they still holding me
14 in AD for the same ticket.
15          Now he came to my door to give
16 me -- to get me to sign -- uhh -- AD hearing
17 paperwork, but the paperwork that he had
18 me sign it was too close to the hearing.
19 They supposed to did it a week ago, but
20 he did it like within three days. So,
21 yeah, he messed up.
22    Q.    Okay.
23    A.    Then the major came to my door
24 talking about she need that piece

**Page 75**

1  of paper back and she need me -- to
2  have me resign some stuff.
3     Q.    Okay.
4     A.    I filed a grievance about that
5  too. Because by him messing up, you know,
6  he messed up my hearing situation for
7  AD. So that hearing would be null and
8  void.
9     Q.    So how do you know that that
10 was done in retaliation?
11    A.    No, no, no. The ticket was
12 done. The ticket was done in retaliation.
13    Q.    How do you know?
14    A.    He messed up. He messed up
15 right there and the major stalled him.
16 The major stalled him and he turned
17 around right after that and say he
18 discovered information that -- uhh --
19 since I'm still here at Stateville I'm
20 still a leader even though I've been
21 in AD six or seven months already.
22          This is what he did. He the
23 one who came up with the ticket. He
24 the one that came up. Because when I

**Page 76**

1  got the ticket beat, right, the ticket
2  -- the grievance officer said that the
3  ticket doesn't state what unauthorized
4  STG activity took place.
5          So here's what they did. They
6  rewrote me another ticket stating that
7  I told somebody to do something and
8  used the same exact confidential form
9  stating it that was in the first
10 ticket.
11    Q.    How do you know that that was
12 done in retaliation?
13    A.    That was done specifically in
14 retaliation because I beat their first
15 ticket.
16          Listen, this is what I need
17 to explain to you. Nobody here beats
18 an IA ticket. Nobody. So when IA
19 writes you a ticket you might as well
20 pack your bags because you're being
21 shipped. That's how they do things
22 here.
23          When I beat that ticket --
24 that's like a scar on their record

**Page 77**

1  when I beat that ticket. Because
2  of their procedural loophole they
3  was angry about that. Because,
4  guess what, when I beat that ticket
5  they didn't let me go. They didn't
6  free me. They didn't give me my
7  property back. They still held me.
8  That right there is retaliatory. I
9  beat the ticket.
10      Now if I beat the ticket they
11  supposed to release me. They didn't.
12  They didn't release me from seg. They
13  held me in seg until they came up with
14  another ticket.
15      Now if you read the rules. If
16  I beat a ticket they supposed to restore
17  me to the place they found me. They
18  never done that. That's in the paperwork
19  too. They never restored me to where
20  they found me at. They still held he
21  arbitrarily and then they told me to
22  my face. Major McGarvey herself told
23  me, oh, I don't believe you have got
24  the full effects of such and such

**Page 78**

1  so we gonna hold you, but this is
2  without a ticket.
3      Q.   When did she say that to
4  you?
5      A.   She said that when I was on
6  the AD wing in X-House in '13. Probably
7  between '13. End of '13 and beginning
8  of '14. This is before. This is before
9  I went to the health care.
10     Q.   Okay.
11     A.   Because I protest. I went
12  on a hunger strike even though I'm
13  sick. I went on a hunger strike. Because
14  I'm saying that here it is I beat this
15  ticket and they ain't letting me go or
16  give me my property. All that is done
17  in retaliation.
18     Q.   Why are you suing Tarry Williams?
19     A.   He was the one -- he as a matter
20  of fact -- well, he the warden that signed
21  off on the expungement of the ticket, but
22  he never -- he never enforced his officer
23  to let me go.
24     Q.   So is that the only reason

**Page 79**

1  why you're suing him in this
2  lawsuit?
3      A.   Yeah.
4      Q.   What's the date of that ticket?
5      A.   That's the 11/7 one that was
6  rewrote on 12/9.
7      Q.   Of 2013?
8      A.   Yes.
9      Q.   Okay.
10     A.   That's the one that I got found
11  guilty on. I filed a grievance. It took
12  them three months. Yeah, three months
13  after to make sure I did the time to
14  expunge it, but I already did seg time
15  anyway.
16     Q.   And that's the only reason
17  why you have Tarry Williams's name
18  in this lawsuit is because he signed
19  off on the expungement for the 2013
20  ticket?
21     A.   And I spoke -- and I spoke to
22  him the same way I talked to everybody
23  else about the procedures and pointed
24  out to him back when I first caught

**Page 80**

1  the ticket in 11, 11/7. So probably
2  like -- umm -- in December sometime.
3  I talked to him when he did rounds
4  with the committee.
5      If it wasn't in December it
6  was in January or February. I talked
7  to him about why am I being prosecuted
8  like this when the ticket was beyond
9  the timeframe. I talked to him
10  face-to-face and asked him why and
11  never got a response.
12     Q.   Why do you believe that him
13  signing off on that ticket was done
14  in retaliation?
15     A.   Because, like I told you, from
16  what Range told me that staff believed
17  that I'm bullying them with their own
18  rules.
19     Q.   When did Range tell you that?
20     A.   He told me that on more than
21  one occasion. He told me that in '15.
22     Q.   That was the first time he
23  told you?
24     A.   Yeah, he told me that after

| | |
|---|---|
| 1  I went through all I went through. I | 1    A.   No. |
| 2  left and came back. | 2    Q.   Prior to that? |
| 3         Because I talked to him | 3    A.   Yeah, '13.  The 11/7 ticket he |
| 4  again.  Because I asked him about | 4  presided over that one. |
| 5  the ticket and I asked him to read | 5    Q.   Was that the only ticket that |
| 6  the ticket and could he tell me what | 6  he presided over? |
| 7  date does it say that I committed the | 7    A.   Yes. |
| 8  offense on.  I already did the year | 8    Q.   Did you have any interaction |
| 9  for it though.  So I asked him.  Just | 9  with him after the 11/7/13 ticket? |
| 10  talking to him because he got a legal | 10    A.   No.  All before 11, 11/7. |
| 11  mind.  I said, can you tell me what | 11    Q.   Okay. |
| 12  date it states that I committed the | 12    A.   As a matter of fact, you know, |
| 13  offense on or what the confidential | 13  he my cell house lieutenant that I was |
| 14  source say I committed the offense | 14  writing up about the yard.  I constantly |
| 15  on?  He said, no, I can't tell you. | 15  wrote him up about the yard.  And when |
| 16    Q.   Did you have any other issues | 16  I went to the Adjustment Committee I told |
| 17  with Williams after 2013? | 17  him it was beyond the timeframe.  He told |
| 18    A.   Probably the beginning of '14. | 18  me it all depends on who is counting the |
| 19    Q.   Was that when he signed the | 19  days.  That's what he said out of his |
| 20  ticket? | 20  mouth.  Then I knew something was funny. |
| 21    A.   When he authorized for it to | 21         Now I knew something was funny |
| 22  be expunged. | 22  about the ticket because when you get |
| 23    Q.   Okay.  And that was the only | 23  a STG ticket nobody gets three months. |
| 24  thing that you're claiming that he | 24  I knew something was wrong with the |
| 81 | 83 |
| 1  did? | 1  whole scenario.  Because when you get |
| 2    A.   Well, yeah.  Because I talked | 2  a STG ticket they giving you a year |
| 3  to him specifically beforehand and he | 3  automatically.  They giving you a |
| 4  still let it go through. | 4  year. |
| 5    Q.   Okay. | 5    Q.   Okay. |
| 6    A.   He still let it go through. | 6    A.   So they gave me three months |
| 7  They dragged their feet on responding | 7  and I'm like, well, why did I get three |
| 8  to my grievance.  Even the counselor | 8  months?  That don't sound right.  Everybody |
| 9  Alex Hall -- umm -- that's another. | 9  I know that caught a STG ticket they got |
| 10  That's another individual that I sued | 10  a year. |
| 11  too. | 11         So when he gave me the |
| 12    Q.   Okay. | 12  three months I started going through. |
| 13    A.   Because I just remembered his | 13  I started going through the rules. |
| 14  name because you brought him up. | 14  I went through every rule in the 504 |
| 15    Q.   What about Clarence Wright, why | 15  for discipline until I found out, |
| 16  are you suing him? | 16  because I didn't know before. |
| 17    A.   He was the one that gave me | 17         So I went piece by piece and |
| 18  -- he the one that presided over the | 18  I went section by section reading every |
| 19  first ticket when he wasn't supposed | 19  single one.  Bam, bam, bam, bam.  Because |
| 20  to. | 20  I got to F-3.  I'm like here.  Go right |
| 21    Q.   On the Adjustment Committee? | 21  here.  This is why.  It stated the 8-day |
| 22    A.   Yeah. | 22  process.  I was like, oh, this is it right |
| 23    Q.   Would that have been the | 23  here. |
| 24  June 2014 ticket? | 24    Q.   Okay. |
| 82 | 84 |

1    A.   So this is how I know
2  that this particular individual,
3  Clarence Wright, because I'm also
4  suing him for the crutch yard stuff.
5    Q.   Okay.  But in this case though
6  the last thing that you -- it occurred
7  in 11/7 of 2013, right?
8    A.   Yes, he the one that found
9  me guilty.
10   Q.   Since then he didn't do
11  anything out of retaliation towards
12  you?
13   A.   No, that right there was the
14  retaliation.
15   Q.   That was the only thing he ever
16  did?
17   A.   Yeah.
18   Q.   Okay.
19   A.   Because he retired after that.
20  He knew he wasn't going to be around
21  for the grievances once they started
22  coming.
23   Q.   W-r-i-g-h-t.
24        Aside from writing you

85

1  disciplinary tickets, sir, do you believe
2  that there was anything else done out of
3  retaliation?
4    A.   Yeah.
5    Q.   What?
6    A.   He took my property.  All of it.
7    Q.   When was that?
8    A.   11/7/13 when he transferred me.
9  He transferred me to Menard without
10  my property.  They took control of
11  it.  They had my property sent to
12  personal property.  The thing was I
13  came back before they got a chance
14  to ship the property.  Before they even
15  sent it.  You know I came back before
16  they even shipped the property to personal
17  property.  It was still in the cell house,
18  in D-House, when I came back.
19        I left 11/7 on transfer.  Even
20  though, you know, I wasn't supposed to
21  be transferred.  I got UIC appointments
22  to see a nephrologist.  I'm already
23  scheduled to see a nephrologist prior
24  to me being transferred.  So somebody

86

1  out of the blue just cancelled my medical
2  permit, skipped my appointments at UIC,
3  and you're going to Menard.
4    Q.   This happened 11/7/2013?
5    A.   Yes.
6    Q.   Okay.  Did you --
7    A.   I want to tell you what
8  happened.  I left.  They shipped me
9  from 11/7/13 because see that's --
10  that's also the retaliatory transfer
11  and now the medical treatment.  Because,
12  you know, that's what that caused.
13        Now when they send me back
14  two days later the -- uhh -- the officer
15  at Menard -- because they put me in
16  the infirmary.
17        So when I got there my
18  blood pressure was out of control.
19  I was way up there.  It was 200 and
20  something over like 120 something.
21  So they like, no, we going to put
22  him in the infirmary.  I stayed in
23  the infirmary for two days at Menard.
24  The correctional officer came to my

87

1  door and told me somebody messed up,
2  they sending you back, but this is
3  after I talked to medical staff.
4        Because once I got there and
5  medical staff did the review and seen
6  my blood pressure they like, oh, we
7  not a grade one.  We not a grade one
8  health care.  I'm going to talk to the
9  medical director about you.  Meaning
10  the IDOC medical director.  Because I
11  wasn't supposed to even be there.  I
12  wasn't supposed to be shipped to
13  Menard.  But, see, I knew this ahead
14  of time.  I knew I wasn't supposed
15  to be shipped because of my medical
16  situation.
17   Q.   Um-hmm.
18   A.   So once I got there they
19  held me in the infirmary.  The officer
20  came and told me somebody messed
21  up and they sending you back.
22   Q.   Okay.
23   A.   So on a Saturday I got shipped
24  back to Stateville.  I got shipped back

88

1  to Stateville on a Saturday. They never
2  do shipments on Saturday unless it's
3  very special. So I was special that
4  day.
5        So on 11/9 -- on 11/9 I came
6  back to Stateville on Saturday. Saturday.
7  I left Menard Saturday morning like
8  8:00 o'clock. A long drive all the
9  way back to Stateville. Well, we
10 stopped at Logan, or Lincoln, and
11 then came to Stateville.
12       Now that's one issue about
13 what happened to me, but my issue
14 was when I came back. I still didn't
15 have my property. They put me in
16 the infirmary for two days over the
17 holiday weekend and then that Tuesday
18 they put me in X-House.
19    Q.  And this was 11/9 of 2013?
20    A.  Yes. And 11/12, three days
21 later, they put me in X-House.
22    Q.  Did you suffer any physical
23 harm as a result of losing your property?
24    A.  Yes.

89

1    Q.  What?
2    A.  Unrestrained blood pressure.
3  Pounding headaches.
4    Q.  As a result of your property
5  being taken?
6    A.  My property. The whole
7  situation. The whole situation got
8  my blood pressure elevated and out
9  of control. And they came doing
10 blood pressure checks twice a day
11 and it was out of control.
12    Q.  Did you suffer any physical
13 injuries as a result of the ticket
14 that you received in June 2014?
15    A.  Yeah.
16    Q.  What?
17    A.  I lost weight. When I got
18 to Pontiac I lost weight. I lost
19 like 50 pounds. I lost like 50 pounds
20 and my kidneys failed. My kidneys
21 failed. Kidneys failed and that's
22 when they had to put me on dialysis.
23    Q.  Did you suffer any physical
24 injuries as a result of the October

90

1  2015 ticket?
2    A.  Well, I was already on --
3  I'm on dialysis now. So everything
4  -- so everything is physical damage
5  now.
6    Q.  Was it resulting from the
7  ticket you received in 2015?
8    A.  It was resulting from the
9  whole -- it was resulting from the
10 whole situation. The whole totality
11 of it that they gave me. That was
12 a whole other year that I had to do
13 in the cell.
14    Q.  Just so I'm clear --
15    A.  And I couldn't -- and no
16 commissary. See, look. The thing
17 without being -- they gave me a ticket
18 and then they took my commissary
19 privileges. I can't buy no food so
20 I have to eat off the commissary. I
21 mean not the commissary, but off the
22 chow hall. That's another stuff that's
23 harming me.
24       Because some days they'll

91

1  try to give me food that I'm not
2  supposed to eat like lunch meat or
3  this or that. Then I got to go
4  through the stress of arguing with
5  the COs about this ain't what I'm
6  supposed to get. As if I'm bothering
7  them.
8        Now they look at me like
9  it's only one tray. They even made
10 that comment. I wrote it up because
11 they said that me just receiving that
12 one tray wouldn't be harmful. I say
13 all it takes is that one tray to make
14 me have a stroke eating salty food,
15 but they made it as if I was being
16 a nuisance to them because I'm
17 complaining about one tray. I'm not
18 supposed to eat it.
19    Q.  So what --
20    A.  It brought my blood pressure
21 up.
22    Q.  What specifically caused your
23 kidney failure?
24    A.  Uncontrollable blood pressure.

92

| | |
|---|---|
| 1   Q.  And then what specifically | 1   Q.  Can you explain how that |
| 2  caused your blood pressure to be | 2  works? |
| 3  uncontrollable? | 3   A.  You file a grievance.  So |
| 4   A.  Stress.  The whole stress of | 4  it depends on the situation how you |
| 5  that whole situation.  Stress of them | 5  want to exhaust.  There's a couple |
| 6  taking my property, bouncing me around, | 6  of ways.  I know two specific ways |
| 7  harassing me. | 7  you can exhaust.  You could file |
| 8   Q.  And when you say the whole | 8  through the normal process or you |
| 9  situation, sir, you mean what happened | 9  could file emergency grievances. |
| 10  on November 7th, 2013 through November 9th, | 10   Q.  If you want to file it through |
| 11  2013? | 11  the normal process how do you go about |
| 12   A.  No, the whole situation.  Meaning | 12  doing that? |
| 13  from 11/7 to the time I got out of seg | 13   A.  Give it to your counselor. |
| 14  in October of '15 or '16.  That's what | 14  Wait for your counselor's response and |
| 15  I mean by the whole situation.  It's | 15  you forward it to the grievance officer. |
| 16  not no singular isolated.  You know it's | 16  They give you a response.  You sign |
| 17  altogether for me.  It's not how you | 17  that with the warden's signature |
| 18  look at it, but for me it's altogether. | 18  on it and you forward that to the |
| 19  Because from the beginning to the end | 19  ARB.  Then you wait for the ARB to |
| 20  all of that to me was arbitrary, | 20  give you a response and you get |
| 21  everything.  Everything that I went | 21  their response and then you exhausted |
| 22  through.  Everything that they did | 22  it once you get the ARB response. |
| 23  to me. | 23   Q.  What if you go through the |
| 24   Q.  Are you on blood pressure | 24  emergency grievance? |
|                   93 |                   95 |
| 1  medication? | 1   A.  Now emergency grievance is |
| 2   A.  Yes, I am. | 2  -- uhh -- you file an emergency grievance |
| 3   Q.  And you're also receiving dialysis | 3  directly to the warden.  Once the warden |
| 4  right now? | 4  signoff on the grievance that level |
| 5   A.  Yes, now I am.  I wasn't prior | 5  -- that level is exhausted. |
| 6  to this.  My kidneys was working.  My | 6      Now you forward that to the |
| 7  kidneys was working at a certain amount. | 7  ARB and whatever answer they give you |
| 8  Once they pushed me over the edge that | 8  at the ARB that's exhaustive.  Because |
| 9  killed all of that. | 9  it's only about notice.  Exhaustion |
| 10   Q.  Are you in kidney failure | 10  is only about notice.  It's giving |
| 11  still? | 11  them the opportunity to respond to |
| 12   A.  No, I'm on dialysis.  Yeah, | 12  whatever your grievance is. |
| 13  you automatically -- it's still kidney | 13   Q.  If you file an emergency |
| 14  failure because -- uhh -- what you call | 14  grievance -- once you receive it back |
| 15  it?  Because you go through end stage | 15  from the warden do you ever forward |
| 16  renal disease.  That's what it's called. | 16  it to your counselor? |
| 17   Q.  Okay. | 17   A.  You don't have to.  Per the |
| 18   A.  And then it's categories.  It's | 18  courts you don't have to. |
| 19  categories.  I was at like one or two | 19   Q.  So once you receive the |
| 20  when it started.  By the time it finished | 20  emergency grievance response from |
| 21  I was at the end on dialysis. | 21  the warden you send it directly to |
| 22   Q.  Are you familiar with the system | 22  the ARB? |
| 23  for exhaustion? | 23   A.  Yes, and that's -- that's a |
| 24   A.  Yes. | 24  set of a certain case law that |
|                   94 |                   96 |

1   state you could do that. I'll
2   tell you the cases. Glick vs. Walker.
3   Thornton vs. Snyder.
4       Q.   That's all right.
5       A.   No, I want you to know because
6   I want it on the record.
7       Q.   Sure. Did any of the incidents
8   that happened in November of 2013 stop you
9   from filing grievances?
10      A.   No, they tried. They tried. That
11  was their intention, but it didn't.
12      Q.   What about the ticket you
13  received in June 2014, sir, does that
14  prevent you from filing any further
15  grievances?
16      A.   No.
17      Q.   Did the ticket you received
18  in October of 2015 prevent you from
19  filing further grievances?
20      A.   No, it was not -- it was not
21  -- it was not a deterrent to me. Because
22  I specifically knew what they was trying
23  to do and why I was going through it.
24  There's a difference.
                                              97

1       Q.   Still to this day are you able
2   to file grievances whenever you have an
3   issue that comes up?
4       A.   Yeah. Sometimes I get overwhelmed
5   like, man, why do I have to keep going
6   through this, you know?
7       Q.   What's the most recent grievance
8   you filed?
9       A.   I don't remember. I don't
10  remember.
11      Q.   Have you filed a grievance like
12  within the past month?
13      A.   I think so. Yeah. Yeah, I
14  did. It was for a ticket. As a matter
15  of fact, yes, I did. It was for a
16  ticket for unauthorized property.
17  As a matter of fact I was just in
18  C grade, B grade. I got a B grade
19  for four days. Tuesday. So I'll
20  be back in A grade.
21      Q.   Okay.
22      A.   Yeah.
23      MS. SHANNON: Can we go off the record
24  just for one second?
                                              98

1       (whereupon, Riley-El Deposition
2       Exhibit Nos. 1 and 2 were
3       marked for identification.)
4   BY MS. SHANNON:
5       Q.   Back on the record.
6       I'm going to hand you what's been
7   marked as Exhibit 1 for your deposition.
8       A.   Um-hmm.
9       Q.   Go ahead and you could take a
10  look at that.
11      A.   Okay.
12      Q.   Do you recognize this document?
13      A.   Yes.
14      Q.   And then if you flip through all
15  three pages. Do you recognize what this
16  is?
17      A.   Yes, it's my grievance.
18      Q.   Is this your grievance that's
19  dated June 15th, 2014?
20      A.   Yes.
21      Q.   And was this grievance written
22  by you?
23      A.   Yes.
24      Q.   Did you write it on June 15th,
                                              99

1   2014?
2       A.   Yes.
3       Q.   Is that your signature there in
4   the middle of the page?
5       A.   Yes.
6       Q.   And then the first page of
7   this exhibit. Have you ever seen this
8   document before?
9       A.   Yeah.
10      Q.   What's this?
11      A.   It's the ARB response.
12      Q.   And this is the response to
13  your June 15th, 2014 grievance from
14  the ARB and this is dated May 21st,
15  2015; is that right?
16      A.   Yeah.
17      Q.   What was the response that
18  you received from the ARB?
19      A.   They basically denied my
20  grievance.
21      Q.   Now if you flip to the second
22  page here. It looks like the part for
23  counselor's response is blank. Did
24  you ever receive a counselor's response
                                             100

1  to this grievance?
2    A.  No, this was sent directly to
3  the ARB from Pontiac.
4    Q.  Did you discuss this issue
5  with your counselor at all before you
6  sent it to the ARB?
7    A.  No, because I got shipped to
8  Pontiac. I didn't get a chance to file
9  this grievance at Stateville. This
10  grievance got sent to the ARB from
11  Pontiac. So by being from Pontiac
12  to another facility -- umm -- so it
13  goes straight to the ARB.
14    Q.  Okay. So you never discussed
15  it with a counselor at Stateville or
16  Pontiac?
17    A.  No, I can't. See, look. Once
18  you get transferred it clearly states
19  on this grievance form, right, that if
20  this grievance -- if this disciplinary
21  report happen in another facility you
22  should direct it to the ARB.
23    Q.  And you never sent it to a
24  warden either before sending it off

        101

1  to the ARB?
2    A.  Not this grievance, no.
3    Q.  Okay.
4    A.  Because what I did was I
5  wrote to the ARB and asked them did
6  they receive any of the grievances.
7  Because I -- I forward it also.
8      Because my thing is I got
9  transferred on, what, the same day
10  that they heard the ticket. I wrote
11  this the same day. I wrote this
12  grievance the same day I got the
13  ticket and they came two or three days
14  later and gave me a hearing and then
15  shipped me. They also took my property
16  too. This was wrote off to Dome in
17  the cell with nothing but a state
18  pen. No paperwork. No nothing.
19    Q.  All right. We are done
20  with this. Could you give that back
21  to the court reporter?
22    A.  Okay.
23    Q.  I'm going to show you next
24  what's been marked as Exhibit 2 for

        102

1  your deposition. Do you recognize
2  this document that I just handed
3  you?
4    A.  Yes.
5    Q.  What's this?
6    A.  This is a grievance. Emergency
7  grievance.
8    Q.  Is this the grievance dated
9  October 19th, 2015?
10    A.  Yes.
11    Q.  And it's written by you?
12    A.  Yes.
13    Q.  And is that your signature in
14  the middle of the page on the second
15  page?
16    A.  Yes.
17    Q.  And page one of this exhibit,
18  sir, have you seen this document before?
19    A.  Yeah.
20    Q.  What's this?
21    A.  It's the ARB response.
22    Q.  Do you recall receiving this
23  ARB response?
24    A.  Yeah.

        103

1    Q.  Did you do anything with it
2  after you got this response back from
3  the ARB?
4    A.  No.
5    Q.  And do you see in the middle
6  it says additional information required
7  and they checked the boxes for provide
8  a copy of your written offender's
9  grievance, DOC0046 including the
10  counselor's response if applicable?
11  Did you ever do that?
12    A.  No.
13    Q.  And then the next box they
14  checked off was provide a copy of
15  the response to offender's grievance,
16  DOC0047, including the grievance
17  officer and chief administrative
18  officer's response to appeal. Someone
19  wrote in it's timely. Did you ever
20  do that?
21    A.  No, because this is what they
22  call extra hoops that I didn't have to
23  jump through, because it's an emergency
24  grievance.

        104

1    Q.  Okay.
2    A.  Like I told you before, the
3 whole process is just to give them
4 notice. Once the warden signoff on
5 it on that level he has responded.
6 Once the ARB give you their response,
7 whatever it is, they have responded.
8 Because you gave them notice too.
9    Q.  So after you finished writing
10 this grievance on October 19th, 2015,
11 what did you do with it?
12    A.  I forwarded it to -- I forwarded
13 it to the -- to put it in the mail to go
14 to the warden.
15    Q.  Was that the institutional
16 mail?
17    A.  Yes. I set it in on my bars.
18    Q.  And you checked the box in the
19 middle for emergency?
20    A.  Yes.
21    Q.  Prior to that you did not
22 discuss this issue with your counselor,
23 right?
24    A.  No. It's an emergency

105

1 grievance and you don't have to
2 discuss your emergency grievances
3 with the counselor.
4    Q.  I'm asking you to try to
5 make a record of exactly your process,
6 okay?
7    A.  Okay. My process is -- I
8 tell you exactly what my process was.
9 I wrote a grievance. I checked the
10 box emergency. I put it in an envelope
11 titled to the warden and put emergency
12 grievance on the envelope. I forwarded
13 it to Warden Pfister. Warden Pfister
14 responded with his signature stating
15 that it's not an emergency. I took
16 that and I made a copy. I kept my
17 copy and forwarded it to the ARB, which
18 is the emergency grievance. I
19 forwarded that to the ARB. The ARB
20 in return sent me this response
21 stating what I needed per their
22 procedural process.
23        But like I told you before,
24 according to the Seventh Circuit,

106

1 Glick vs. Walker and Thornton vs. Snyder,
2 they do not get a second chance at a
3 grievance once the warden has signed off
4 on it. Because the warden is the highest
5 official. The chief administrative officer
6 in the facility. Once he signoff on
7 it I do not have to resubmit it, even
8 though they say resubmit it. The court
9 has already ruled on this. That's why I
10 did this process this way.
11    Q.  Okay. After you received the
12 emergency review response from the warden --
13    A.  Yes.
14    Q.  -- did you ever at any point send
15 it to the grievance officer?
16    A.  No.
17    Q.  Did you ever send it to the warden
18 again before you sent it to the ARB?
19    A.  No, because the signature is
20 already on it. I don't have to.
21    Q.  So you never received a warden's
22 response to this grievance aside from the
23 emergency review portion?
24    A.  That's the response. Because

107

1 there's nobody else here higher than
2 the warden. Even if I resubmit it.
3 Even if I resubmit it to the counselor
4 the warden had already gave a specific
5 response to the grievance.
6    Q.  To the emergency review
7 portion?
8    A.  But what I'm saying is he
9 read it. He read and saw what it
10 consisted off. That's his response.
11 See, I wish -- I wish I would have
12 brung the cases specifically to show
13 you how the court rules on it.
14    Q.  So if you look at this
15 grievance.
16    A.  Um-hmm.
17    Q.  The warden signed off on
18 the emergency review portion indicating
19 no.
20    A.  Not -- no. An emergency is not
21 substantiated.
22    Q.  Right.
23    A.  Offender should submit this
24 grievance in the normal manner.

108



```
 1    That's the second.  That's the second
 2    go-round.
 3         Q.   And you did not do that?
 4         A.   No.  No, I did not because
 5    that's the second round.  No, I did
 6    not.
 7         Q.   That's my question.
 8         A.   No, I did not.
 9         Q.   Okay.
10         A.   Because --
11         Q.   That's fine.
12         A.   I can't answer that?  That's
13    part of my answer.  I can't answer
14    that?  Well, I'm fittin to say something
15    else.
16         Q.   The question only required --
17         A.   So now you cutting me off
18    when I try to answer.
19         Q.   Go ahead.
20         A.   I'm giving you my reasoning on
21    why I didn't do it.
22         Q.   Go ahead.
23         A.   Because you won't let me finish.
24    The reason why I didn't resubmit it
                                            109
```

```
 1    was because I wasn't required to.  See
 2    once he signoff on it it's not required
 3    for me to resubmit it.  Even though
 4    they say it in their procedures, you
 5    know, the court say I don't have to
 6    give them a second shot at the grievance.
 7         Q.   Okay.  For the record,
 8    Exhibit 1 was Bates stamped IDOC 86101
 9    through 102.  And Exhibit 2 is Bates
10    stamped 45 through 47.  And if you
11    could go ahead and hand that back to
12    the court reporter, please.
13         A.   Okay.
14         Q.   Can you tell me what type of
15    relief you're seeking from this case?
16         A.   I want the disciplinary reports
17    expunged.  I want the harassment to
18    stop.  I want my property replaced
19    or compensated for my property.  What
20    else?  And any other relief the court
21    deems proper and right.
22         Q.   Are you seeking --
23         A.   Or just.
24         Q.   Are you seeking monetary damages?
                                            110
```

```
 1         A.   Yeah.
 2         Q.   How much money?
 3         A.   Say $20,000.  And, you know,
 4    the fact that I lost my kidney function.
 5    I still got high blood pressure and about
 6    to die.
 7         Q.   All right.  That's all the
 8    questions that I have for you today.
 9         A.   Okay.
10         Q.   So I just want to go over
11    with respect to the transcript of
12    the deposition that the court reporter
13    took down.
14              Sir, you have the option to
15    reserve signature.
16         A.   Um-hmm.
17         Q.   In which case I would send you
18    a copy of the transcript and you would
19    have 30 days to review it for clerical
20    errors only.  You can't make any
21    substantive changes and then you would
22    send it back.
23              Or if you trust that she
24    took down everything accurately, sir,
                                            111
```

```
 1    then you could waive your signature
 2    and we'll be done with it.
 3         A.   Um-hmm.
 4         Q.   So it's up to you if you would
 5    like to reserve your signature or waive
 6    your signature.
 7         A.   I want to reserve because I
 8    want to review it.
 9         MS. SHANNON:  Okay.  That's it.  Send
10    me the letter and I'll provide it to
11    Mr. Riley-El.
12         THE COURT REPORTER:  Okay.
13              (DEPONENT SAITH NAUGHT.)
14                   (whereupon, the proceedings
15                   concluded at 1:14 p.m.)
16
17
18
19
20
21
22
23
24
                                            112
```

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4
 5   WILLIAM D. RILEY-EL,        )
     Inmate No. B-03069,         )
 6              Plaintiff,       )
        vs.                      )No. 15 CV 11180
 7   SALVADOR GODINEZ,           )
     et al.,                     )
 8              Defendants.      )
 9
10       I, WILLIAM D. RILEY-EL, being first
11   duly sworn, on oath say that I am the
12   deponent in the aforesaid deposition
13   taken on the 21st day of September 2018;
14   that I have read the foregoing transcript
15   of my deposition, and affix my signature
16   to same.
17
         _____
18              WILLIAM D. RILEY-EL
19
20   Subscribed and sworn to
     before me this        day
21   of           , 2018
22
23
24   Notary Public
                                        113
```

```
 1   STATE OF ILLINOIS      )
 2                          )  SS:
 3   COUNTY OF C O O K      )
 4       I, Dawn C. Evers, a notary public within
 5   and for the County of Cook County and State of
 6   Illinois, do hereby certify that heretofore,
 7   to-wit, on September 21st, 2018, personally
 8   appeared before me, at 16830 South Broadway
 9   Street, Crest Hill, Illinois, WILLIAM D.
10   RILEY-EL, Inmate No. B-03069, in a cause now
11   pending and undetermined in the United States
12   District Court for the Northern District
13   of Illinois, Eastern Division, wherein
14   WILLIAM D. RILEY-EL, is the Plaintiff,
15   and SALVADOR GODINEZ, et al., are the
16   Defendants.
17       I further certify that the said
18   WILLIAM D. RILEY-EL, Inmate No. B-03069,
19   was first duly sworn to testify the truth,
20   the whole truth and nothing but the truth
21   in the cause aforesaid; that the testimony
22   then given by said witness was reported
23   stenographically by me in the presence
24   of the said witness, and afterwards reduced
                                        114
```

```
 1   to typewriting by Computer-Aided Transcription,
 2   and the foregoing is a true and correct
 3   transcript of the testimony so given by
 4   said witness as aforesaid.
 5       I further certify that the signature
 6   to the foregoing deposition was reserved
 7   by counsel for the respective parties and
 8   that there were present at the deposition
 9   the attorneys hereinbefore mentioned.
10       I further certify that I am not
11   counsel for nor in any way related to the
12   parties to this suit, nor am I in any way
13   interested in the outcome thereof.
14       IN TESTIMONY WHEREOF:  I have hereunto
15   set my hand and affixed my notarial seal this
16   28th day of September, 2018.
17
18
19
20       ILLINOIS CERTIFIED SHORTHAND REPORTER
21
22
23
24
                                        115
```

```
 1           McCorkle Litigation Services, Inc.
 2           200 N. LaSalle Street, Suite 2900
                 Chicago, Illinois 60601
 3   September 28th, 2018
 4   Office of the Attorney General
     Ms. Colleen M. Shannon
 5   c/o William D. Riley-El
     100 W. Randolph St., 13th Floor
 6   Chicago, Illinois 60601
     IN RE:  Riley-El vs. Godinez, et al.
 7   COURT NUMBER:  15 CV 11180
     DATE TAKEN:  9-21-18
 8   DEPONENT:  William Riley-El, Inmate No. B-03069
 9
     Dear Ms. Shannon:
10
     Enclosed is the deposition transcript for the
11   aforementioned deponent in the above-entitled
     cause.  Also enclosed are additional signature
12   pages, if applicable, and errata sheets.
13   Per your agreement to secure signature, please
     submit the transcript to the deponent for review
14   and signature.  All changes or corrections must
     be made on the errata sheets, not on the
15   transcript itself.  All errata sheets should be
     signed and all signature pages need to be signed
16   and notarized.
17   After the deponent has completed the above,
     please return all signature pages and errata
18   sheets to me at the above address, and I will
     handle distribution to the respective parties.
19
     If you have any questions, please call me at
20   the phone number below.
21   Sincerely,
22
     Cindy Alicea            Court Reporter Present:
23   Signature Department        Dawn C. Evers
     Calicea2@mcdeps.com
24
                                        116
```

**Exhibits**

**Deposition Exhibit 1**
3:12 99:7 110:8

**Deposition Exhibit 2**
3:13 102:24 110:9

**$**

**$20,000**
111:3

**0**

**03**
15:22
**07**
15:8 16:3 44:10
**08**
43:23 44:10
**09**
43:23

**1**

**1**
99:2,7 110:8
**102**
110:9
**11**
20:7,10 80:1 83:10
**11/12**
89:20
**11/13**
69:16
**11/7**
16:6 22:10,14 23:1
69:17 71:9 79:5 80:1
83:3,10 85:7 86:19
93:13
**11/7/13**
20:1,4 41:12 83:9
86:8 87:9
**11/7/2013**
87:4
**11/9**
16:6 89 5,19
**11180**
4:24
**12/9**
71:10 79:6
**120**
87:20
**13**
14:8,22 16:6 34:6
52:17 53:18 58:20
67:4,24 69:1,2,16
70:22 76:6,7 83:3
**14**
14:23 34:2,4 36:24
78:8 81:18
**14th**
62:9
**15**
4:24 14:2,3 17:2
20:7,10 34:2,4 53:6
64:3 80:21 93:14
**15th**
22:15,17 99:19,24
100:13
**16**
16:17 41:13 93:14
**19th**
103:9 105:10
**1:14**
112:15

**2**

**2**
99:2 102:24 110:9
**20**
22:12,13 24:17,23
28:18 37:13,18
**200**
87:19
**2000**
65:6
**2002**
13:4 15:21,22,23
16:13
**2003**
15:23 16:1 65:7
**2007**
15:12
**2010**
38:14 58:4
**2013**
33:19,21 51:15
52:20 79:7,19 81:17
85:7 89:19 93:10,11
97:8
**2014**
14:24 15:9 37:1,2
42:1 47:21 82:24
90:14 97:13 99:19
100:1,13
**2015**
15:2 20:11 50:7
91:1,7 97:18 100:15
103:9 105:10
**2016**
34:24
**21st**
100:14
**2nd**
13:4

**3**

**30**
111:19

**4**

**441**
16:16
**45**
110:10
**47**
110:10

**5**

**50**
90:19
**504**
24:8 29:19 84:14
**5:00**
6:2

**6**

**6**
19:21 20:3

**7**

**730**
24:21
**7th**
93:10

**8**

**8**
22:5,8,23 23:5 24:6
**8-day**
84:21
**86101**
110:8
**8:00**
89:8

**9**

**9th**
93:10

**A**

**ability**
6:5 53:22 54:24
64:12 67:3
**accurately**
111:24
**accuse**
32:8
**acknowledging**
18:24
**act**
53:16 61:17 63:2
68:18
**acting**
53:2,10
**actions**
26:22,23 27:2,9 62:3
**active**
53:3
**activities**
41:4 68:9
**activity**
36:14 41:22 44:18
54:10 64:11 76:4
**actual**
59:21
**AD**
14:11 19:22,23 23:7,
13 33:17 41:3,12,15
45:15 46:18 51:12,
13 52:17 64:5 67:8
68:9 69:23 70:6,10
74:12,14,16 75:7,21
78:6
**add**
71:11
**additional**
104:6
**Adjustment**
50:2,3,19 61:16
82:21 83:16
**administrative**
14:11 16:23 24:17,
23 28:18,20 64:6
104:17 107:5
**admission**
13:2
**affect**
6:4,9
**affecting**
64:19
**affidavits**
70:13
**affiliated**
32:15,21 33:1
**affiliation**
32:3
**agenda**
68:22,23 69:22
**ahead**
88:13 99:9 109:19,
22 110:11
**Alex**
82:9
**allegations**
19:19
**alleged**
19:8 44:17
**allergies**
6:1
**allergist**
65:2
**allowed**
39:15
**altercation**
39:3
**altogether**
93:17,18
**amount**
94:7
**angry**
77:3
**answers**
8:13
**appeal**
51:4,5 104:18
**applicable**
4:21 104:10
**appointed**
59:16
**appointing**
60:18
**appointments**
86:21 87:2
**appoints**
61:8
**April**
13:4
**ARB**
95:19,22 96:7,8,22
100:11,14,18 101:3,
6,10,13,22 102:1,5
103:21,23 104:3
105:6 106:17,19
107:18
**arbitrarily**
36:10 68:4 77:21
**arbitrary**
22:18 23:21 24:2
25:5,6,11 26:18,23
27:2,9 46:7 51:22
93:20
**argued**
73:16
**arguing**
92:4
**arguments**
51:13,20
**arm**
37:8
**assign**
59:5
**assignments**
59:6 60:19
**assistant**
51:17,18
**assume**
8:10 56:14 67:16
**assumed**
45:24
**assuming**
45:17 49:14 59:1
67:12
**assumption**
60:23,24
**attack**
45:20 46:23
**August**
58:7 66:21
**authorize**
21:18 57:17
**authorized**
21:24 22:6 63:16
81:21
**authorizing**
70:9
**automatically**
84:3 94:13
**aware**
31:20 41:23 46:22
47:1 55:14 58:16
59:2,12 62:14 66:7,
13

**B**

**B-03069**
4:17
**back**
14:2 16:9 17:1
33:23,24 34:8,10
35:3 44:20 45:7,12,
13,18 46:2 52:10
53:7 67:20 71:1,8
75:1 77:7 79:24 81:2
86:13,15,18 87:13
88:2,21,24 89:6,9,14
96:14 98:20 99:5
102:20 104:2 110:11
111:22
**bags**
76:20
**ball**
22:18
**barn**
84:19
**bars**
105:17
**based**
9:19 12:9 25:16
45:24 50:18 59:2
**basically**
100:19
**Bates**
110:8,9
**beat**
43:23 76:1,14,23
77:1,4,9,10,16 78:14
**beats**
76:17
**bed**
37:11 41:1
**bedridden**
37:9
**beginning**
78:7 81:18 93:19
**believed**
50:10 55:4 80:16
**Bennett**
21:8
**Best's**
82:3
**big**
71:12
**bin**
55:24
**blah**
42:9 43:9,10
**blamed**
45:19
**blank**
100:23
**blankly**
70:2
**blood**
5:19 6:3 87:18 88:6
90:2,8,10 92:20,24
93:2,24 111:5
**blue**
46:7 87:1
**bothering**
92:6
**bottom**
42:23
**bounced**
17:7
**bouncing**
93:6
**box**
104:13 105:18
106:10
**boxes**
104:7
**break**
9:3
**breaking**
22:1 25:18
**bringing**
27:21 28:3
**broke**
25:13 48:4
**broken**
46:4
**brought**
6:11 82:14 92:20
**brung**
108:12
**bullying**
72:8 80:17
**bunch**
69:12
**busy**
18:16,18
**buy**
91:19

**C**

**C-441**
13:21,22
**C-H-E-R-R-Y**
63:19
**C-HOUSE**
13:19 16:16 35:1
**C-L-E-M-E-N-T-S**
44:7
**cadets**
25:24
**call**
22:19 29:6 39:10
60:21 94:14 104:22
**called**
46:12 50:22 94:16
**cancelled**
87:1
**care**
66:12 69:3 74:11
78:9 88:8
**case**
4:22,23 5:8 7:20,24
9:17 14:13 19:9
20:16 36:3,7 47:8
50:18 56:22 85:5
98:24 110:15 111:17
**cases**
7:13,17 30:12 31:5,
12 97:2 108:12
**catch**
35:10
**catching**
67:19
**categories**
94:18,19
**caught**
79:24 84:9
**caused**
87:12 92:22 93:2
**cell**
13:17,20 16:16,18
17:5,11,12,16 37:10,

**11** 56:10 83:13
86:17 91:13 102:17
**cellmate**
17:3,15,19 18:4,8
**cells**
17:9
**celly**
41:19
**Center**
13:15
**chance**
86:13 101:8 107:2
**change**
58:6
**changed**
60:8
**changing**
70:12
**character**
27:14
**Charles**
36:4
**checked**
104:7,14 105:18
106:9
**checks**
90:10
**Cherry**
63:9,22 65:9,16 66:7
67:7
**chief**
28:20 104:17 107:5
**chow**
91:22
**Circuit**
106:24
**Civil**
4:21
**claim**
31:10
**claiming**
64:5 68:17 81:24
**claims**
19:15 31:13
**Clarence**
82:15 85:3
**clear**
91:14
**Clements**
21:7 43:14 44:6,22
46:1,21
**clerical**
111:19
**close**
74:18
**closed**
34:19
**Code**
24:17,21,23 28:18
**cold**
39:12
**collaborated**
61:12
**Colleen**
5:6
**colluded**
22:20 62:21
**collusion**
61:23
**combined**
8:1
**commander**
58:20 59:3,4 61:6,7
**comment**
92:10
**commissary**
91:16,18,20,21
**commission**
24:6

**committed**
36:20 40:18 45:3
46:9 62:12,19 81:7,
12,14
**committee**
23:13 50:2,3,19
51:20 61:16 80:4
82:21 83:16
**communication**
41:20,21
**commuted**
13:10
**compensated**
110:19
**complaining**
48:21 58:14 92:17
**complaint**
19:9
**concluded**
112:15
**Condition**
7:18
**conditions**
7:23 31:6
**conduct**
27:13
**conference**
43:6
**confidential**
32:5 46:13 62:15,17
76:8 81:13
**confinement**
7:18 31:6
**consisted**
108:10
**conspiring**
50:23
**constantly**
38:18 56:13 83:14
**Constitutional**
54:12,18
**contained**
19:5
**continuous**
66:10
**control**
86:10 87:18 90:9,11
**controls**
59:4
**convene**
24:5
**conversation**
73:17
**conversations**
53:18
**convicted**
13:6 28:10
**copy**
104:8,14 106:16,17
111:18
**correct**
9:15 19:12 51:8
59:13,14 72:2
**correctional**
13:15 52:4 87:24
**Corrections**
12:23 24:21 27:23
**correctly**
26:12,15 59:18
**COS**
28:12 92:5
**cosigned**
43:17 50:11
**counseling**
54:16
**counselor**
42:7,10,16,18,19,22,
23 49:6,19,20 82:8
95:13 96:16 101:5,
15 105:22 106:3

**108**:3
**counselor's**
95:14 100:23,24
104:10
**counting**
83:18
**couple**
18:7 57:3 69:11 95:5
**court**
5:13 8:14 11:23
31:11 70:12 102:21
107:8 108:13 110:5,
12,20 111:12 112:12
**courts**
96:18
**cover**
16:11
**covering**
20:3
**crack**
64:14,19
**crime**
13:5
**crutch**
48:12,16 65:6,7 85:4
**crutches**
38:16
**custody**
41:15 46:18
**cut**
30:2
**cutting**
109:17
**CV**
4:24

---

**D**

**D-HOUSE**
68:24 86:18
**damage**
91:4
**damages**
110:24
**danger**
53:21
**date**
10:20 13:3,12 20:6
22:10 38:15,17,19
40:18 45:2 62:18
69:11 71:9 79:4
81:7,12
**dated**
99:19 100:14 103:8
**dates**
10:15 15:6 22:24
71:18
**David**
61:10
**day**
39:4 89:4 90:10 98:1
102:9,11,12
**day-to-day**
68:9
**days**
16:4 22:5,8,23 23:5
24:6 69:11 74:20
83:19 87:14,23
89:16,20 91:24
98:19 102:13 111:19
**December**
43:23 80:2,5
**decide**
57:7
**decided**
29:12
**decision**
40:14
**deems**
110:21

**defendant**
36:6 50:17
**defendants**
5:7 20:15,17 36:2
55:13
**Delta**
68:24
**denial**
31:6 53:14
**denied**
53:12 100:19
**Department**
7:11 12:23 27:23
**depends**
83:18 95:4
**DEPONENT**
112:13
**deposed**
6:17
**deposition**
4:19 6:14 9:18 12:16
19:10 30:2 99:1,7
103:1 111:12
**depositions**
7:13
**Deputy**
23:14
**detail**
39:20
**Detention**
14:12 64:6
**determines**
57:10
**deterrent**
97:21
**dialysis**
90:22 91:3 94:3,12,
21
**die**
111:8
**difference**
97:24
**direct**
101:22
**directly**
43:12 48:21 72:23,
24 96:3,21 101:2
**director**
23:14 88:9,10
**disciplinary**
20:22,23 24:4 27:10
29:12 32:16,22 88:1
101:20 110:16
**discipline**
35:13 84:15
**disciplined**
35:12,14,17
**discovered**
46:11 75:18
**discovery**
9:17
**discuss**
101:4 105:22 106:2
**discussed**
101:14
**disease**
94:16
**dishonesty**
35:18
**District**
5:1
**Division**
5:2
**DOC0046**
104:9
**DOC0047**
104:16
**document**
99:12 100:8 103:2,
18

**documentation**
32:10,14
**documented**
31:21
**documents**
9:14 10:6 12:19
**Dome**
102:16
**door**
23:11 37:14 52:1
71:16 74:15,23 88:1
**downstairs**
55:24
**dragged**
82:7
**drained**
6:6,7
**drive**
89:6
**due**
24:11 51:6
**duly**
4:1,5

---

**E**

**E-L**
4:14
**earlier**
36:4
**Eastern**
5:2
**eat**
91:20 92:2,18
**eating**
92:14
**edge**
94:8
**effect**
60:8
**effects**
77:24
**elevated**
90:8
**emergency**
48:20 58:14 66:20
72:22 95:9,24 96:1,
2,13,20 103:6
**employee**
35:21
**employees**
30:13
**end**
17:13 78:7 93:19
94:15,21
**enforce**
28:13,22,24 54:11
72:1
**enforced**
78:22
**enforcement**
28:7,8
**engaged**
41:22
**entered**
18:20
**envelope**
106:10,12
**equally**
38:20 39:7,8
**Erratic**
36:13
**errors**
111:20
**et al**
4:23

**events**
14:12 19:8 20:3
**everyday**
55:21 56:11
**exact**
76:8
**EXAMINATION**
5:4
**examined**
4:5
**exhaust**
95:5,7
**exhausted**
95:21 96:5
**exhaustion**
73:5 94:23 96:9
**exhaustive**
96:8
**exhibit**
11:20 12:7,9 99:2,7
100:7 102:24 103:17
110:8,9
**exhibits**
12:4
**expectancy**
64:24
**expecting**
66:24
**experience**
26:1,4
**explain**
25:15 26:24 41:7
67:1 76:17 95:1
**explained**
71:16
**expunge**
79:14
**expunged**
70:24 74:13 81:22
110:17
**expungement**
78:21 79:19
**extra**
104:22

---

**F**

**F-3**
84:20
**F-HOUSE**
34:14,18
**F-R-E-D-R-I-C-K-S**
50:5
**fabricated**
20:22
**face**
70:2 72:6,11 77:22
**face-to-face**
80:10
**facility**
14:4 16:12 38:13
101:12,21 107:6
**fact**
18:19 28:4 31:9 37:6
44:9,14 66:4 78:20
83:12 98:15,17
111:4
**failed**
90:20,21
**failure**
92:23 94:10,14
**fair**
67:16
**fairly**
38:21
**false**
35:20
**familiar**
19:4 94:22





**February**
80:6
**Federal**
4:21
**feel**
6:13 72:8
**feet**
82:7
**felon**
28:10
**figuring**
44:4
**file**
49:4 53:22 55:1,15
72:20,24 95:3,7,9,10
96:2,13 98:2 101:6
**filed**
7:7,9 10:10,11 19:23
23:18 58:10 66:18,
20,22 67:3,8 75:4
79:11 98:8,11
**filing**
28:1 41:24 48:20
55:10 66:14 72:22
97:9,14,19
**find**
31:3 36:11 69:20,21
**finding**
36:16
**fine**
9:8 10:1 21:14
109:11
**finish**
8:18 109:23
**finished**
94:20 105:9
**fistula**
37:8
**fittin**
40:7 45:13 73:21
109:14
**flip**
99:14 100:11
**flowing**
55:19
**follow**
25:8,9,12,18 26:8,
11,14 27:6,7,8 28:1,
11,15,21,23 63:18
**follow-up**
49:11
**food**
91:19 92:1,14
**form**
76:8 101:19
**forward**
6:14 95:15,18 96:6,
15 102:7
**forwarded**
105:12 106:12,17,19
**found**
36:9,18 37:17 41:1
46:19 62:22 77:17,
20 79:10 84:15 85:8
**fourth**
17:11
**Fredricks**
21:3,4,5 47:6 48:15,
22 49:1,16
**free**
77:6
**freezing**
39:12
**fresh**
11:14
**front**
9:14 56:12
**full**
77:24

**function**
111:4
**funny**
83:20,21

## G

**gang**
23:2 31:15,17,21
32:3,15,20,24 41:6,
22 44:18 54:1,10,20,
22 64:11 65:5 67:5
74:5,6
**gave**
32:22 46:15,20
52:22 53:13 82:17
84:6,11 91:11,17
102:14 105:8 108:4
**general**
10:19 23:23
**give**
8:13 24:11 25:14
33:23 42:8,12 67:19,
21 74:15 77:6 78:16
92:1 95:13,16,20
96:7 102:20 105:3,6
110:6
**giving**
19:10 35:20 38:22,
23 39:9 84:2,3 96:10
109:20
**Glick**
97:2 107:1
**go-round**
109:2
**Godinez**
4:23
**Gomez**
23:15
**good**
11:8 54:5
**gossip**
65:17
**gossiping**
47:4 65:15,16
**grade**
88:7 98:18,20
**grievance**
10:13,15 23:18,19
37:24 38:3,4 42:5,
10,12,24 48:24 49:2,
5,6 52:14 53:15
58:10 66:20 72:19,
20,23 75:4 76:2
79:11 82:6 95:3,15,
24 96:1,2,4,12,14,20
98:7,11 99:17,18,21
100:13,20 101:1,9,
10,19,20 102:2,12
103:6,7,8 104:9,15,
16,24 105:16 106:1,
9,12,18 107:3,15,22
108:5,15,24 110:6
**grievances**
10:11 19:20,23
38:18 41:24 43:11
48:17,20 49:4,17
51:4 53:23 55:1,7,14
58:3,9,14,21 59:21
60:7,12 65:10 66:8,
13,14,18,23 73:8
85:21 95:9 97:9,15,
19 98:2 102:6 106:2
**grieved**
53:11
**guess**
12:11 44:4 46:19
56:13 77:4
**guilty**
36:9,11,15,19 37:17
41:1 46:19 62:22

**guy**
74:10
**gym**
39:13

## H

**H-O-S-S-E-L-T-O-N**
50:5
**hall**
82:9 91:22
**hand**
12:3 99:6 110:11
**Handbook**
18:21 19:6
**handed**
11:20 103:2
**happen**
101:21
**happened**
14:13 44:11 69:10,
17 87:4,8 89:13 93:9
97:8
**harassing**
93:7
**harassment**
110:17
**Hardy**
38:15
**harm**
89:23
**harmful**
92:12
**harming**
91:23
**he'll**
57:19
**head**
26:20,22 27:3 53:4
**headache**
5:24
**headaches**
90:3
**heads**
29:14
**health**
66:12 69:3 74:11
78:9 88:8
**hear**
8:5
**heard**
45:19,21 56:2 85:17
70:14 102:10
**hearing**
28:21 37:10,12,21
40:10,13 50:19
55:18 57:9 83:17
70:17 71:5 74:16,18
75:6,7 102:14
**held**
16:21,22 20:8 33:14
34:13,20 37:6,10,12
77:7,13,20 88:19
**helped**
55:15
**helping**
23:23 48:16 53:22
55:8
**hiding**
70:1
**high**
5:19 111:5
**higher**
108:1
**highest**
28:19 107:4
**hill**
22:18

**history**
38:10
**hold**
5:11 22:2 23:22 56:1
57:14 78:1
**holding**
22:3 23:6 55:24
74:13
**holiday**
89:17
**homies**
69:6
**hoops**
104:22
**hospital**
37:11 40:24 41:2
**Hosselton**
49:23
**house**
13:17 56:10 68:24
83:13 86:17
**housed**
33:4
**housing**
64:8
**hunger**
78:12,13
**hyphen**
4:14

## I

**IA**
21:7 43:16,17,18
74:3 76:18
**Identification**
99:3
**IDOC**
4:16 5:7 7:10 18:20
20:17 25:8,23 30:13
31:20 32:1 35:12
88:10 110:8
**Illinois**
5:1 12:23 24:24
**immediately**
23:20
**impossible**
10:12 11:16 46:17
60:15
**improvement**
66:11
**incarcerated**
7:14 11:11 12:22
13:14
**incident**
22:5,10
**incidents**
97:7
**including**
104:9,16
**indicating**
108:18
**individual**
35:9 38:17 49:24
58:2,5 59:10 64:4
70:14 71:23 72:4
82:10 85:2
**individual's**
20:19
**individuals**
20:21 23:16 25:21
38:16 50:23 55:5
**infirmary**
37:7 87:16,22,23
88:19 89:16
**influence**
34:17 64:10,11
**information**
19:5 35:21 46:12
78:18 104:6

**informed**
49:16
**initial**
57:13
**initiated**
74:4
**injuries**
90:13,24
**inmate**
18:21 19:6 28:9 40:8
45:22 52:5
**inmates**
56:1
**inside**
19:5 28:20
**institution**
55:21 56:11 65:24
**institutional**
105:15
**intellectual**
72:14
**intention**
97:11
**intentionally**
22:9,17 23:3 71:1
**interaction**
83:8
**interviewed**
49:18
**investigate**
42:7,10 49:7
**investigation**
44:18
**investigator**
29:21 63:17 70:18
71:5
**involve**
31:13
**involved**
49:22 61:5 68:8
**irritant**
64:23
**isolated**
53:20 93:16
**issue**
54:19 55:2 59:15
89:12,13 98:3 101:4
105:22
**issues**
40:11 51:6 81:16

## J

**J-O-E-L**
74:1
**Jannetta**
21:8
**January**
15:24 80:6
**Jenny**
68:6 69:24
**Jill**
49:23 61:19
**job**
40:8 47:14 52:9
54:4,5,23 57:16
59:11,18
**Joel**
74:1
**Joshua**
43:14
**July**
14:3 15:1 66:21
**jump**
104:23
**June**
14:3,23,24 15:9 42:1
47:20 62:9 66:21
82:24 90:14 97:13

99:19,24 100:13

## K

**keeping**
39:11
**Kevin**
58:21
**key**
26:10
**kickout**
34:21
**kidney**
92:23 94:10,13
111:4
**kidneys**
90:20,21 94:6,7
**killed**
94:9
**knew**
23:21 24:2 25:4,6,21
48:19 49:2 55:3
60:11 67:12 73:9
83:20,21,24 85:20
88:13,14 97:22
**knowing**
26:2
**knowledge**
59:21

## L

**lady**
88:21
**Lamb**
50:24 52:11,18
**Laske**
58:21 58:16 60:11
**Lastly**
9:13
**law**
24:24 25:2,17,19
28:17 54:3 96:24
**lawsuit**
19:14,19 20:2 55:1,
14 79:2,18
**lawsuits**
7:6,9 53:23 55:10,11
66:22 67:3,8
**lead**
64:19
**leader**
23:2 54:1 67:5 74:6,
7 75:20
**leave**
55:22
**led**
19:22
**left**
44:19 81:2 86:19
87:8 89:7
**legal**
23:24 81:10
**legitimate**
27:16
**Lemke**
20:20
**letter**
112:10
**letting**
78:15
**level**
96:4,5 105:5
**library**
54:3
**lieutenant**
21:2,3,4 36:8,9 38:6,
8,11 41:16,23 42:16
43:12 83:13



**lieutenants**
65:21
**life**
13:10 64:24 67:24
**Lincoln**
89:10
**Listen**
76:16
**live**
64:18,24
**living**
13:17 16:15,18
**Logan**
89:10
**long**
9:6 13:24 14:7
16:15,24 18:3 33:14
38:9,10 66:5 68:1
69:1 73:17 89:8
**longest**
33:18
**loophole**
73:7 77:2
**losing**
89:23
**lost**
47:14 90:17,18,19
111:4
**lot**
9:13 48:13,14 55:19
56:3
**lucky**
69:5,8,9,14
**lunch**
92:2
**lying**
35:15

**M**

**M-A-N-S-F-I-E-L-D**
63:21
**M-A-R-S-H-A-L-L**
63:20
**M-C-G-A-R-V-E-Y**
69:24
**made**
24:19 59:11 60:6
68:13,14 92:9,15
106:16
**mail**
105:13,16
**main**
56:24
**major**
21:4,5,6,16 23:14
26:5 27:19 29:22
40:3,4 47:12 48:5
56:23 57:6,7,8,11
61:5 63:11,17 68:7
70:5 74:23 75:15,16
77:22
**majors**
22:19 26:6 29:11
57:5 65:21
**make**
22:2 26:7 28:16
72:20 73:22 79:13
92:13 106:5 111:20
**makes**
25:10
**making**
60:22,24 65:4
**man**
98:5
**mandate**
31:11
**manner**
108:24

**Mansfield**
61:10,20 62:21 63:2
**marked**
99:3,7 102:24
**Marshall**
21:5 63:9,22 65:9,16
66:7 67:7
**matter**
31:9 37:5 40:23,24
44:9,14 78:19 83:12
98:14,17
**Mcgarvey**
21:6 40:4 68:6 69:24
77:22
**meaning**
66:11 88:9 93:12
**means**
22:2 23:9 26:15,16
**meat**
92:2
**medical**
7:11,19,24 31:7
55:17 66:14,15,18
87:1,11 88:3,5,9,10,
15
**medication**
11:12 94:1
**medications**
5:15
**medicine**
6:4
**meds**
5:19
**meeting**
43:6
**meetings**
53:20,21,22 66:1,2
67:10
**member**
31:21 42:11,14 43:8,
9 54:20,22 59:15
65:5 74:5,6
**member's**
43:1
**members**
42:13 49:5,22 52:4,6
54:13 60:20
**memory**
6:9 11:7,8,22 30:16
**Menard**
15:22,23 16:4,8 18:5
86:9 87:3,15,23
88:13 89:7
**mentioned**
36:3
**mess**
72:7
**messed**
74:21 75:6,14 88:1,
20
**messing**
75:5
**Michael**
70:16
**middle**
100:4 103:14 104:5
105:19
**mind**
11:14 21:21 81:11
**minor**
57:8,11
**minute**
22:14
**minutes**
37:13,18
**mistakes**
72:3
**mold**
64:19

**monetary**
110:24
**money**
111:2
**month**
14:20 16:2 68:2
98:12
**month-and-a-half**
15:13 44:16,19
**months**
14:8,22 18:7 19:21
20:3 33:18 34:6
73:2,3 75:21 79:12
83:23 84:6,8,12
**morning**
5:16 6:1,2 89:7
**mouth**
40:7 72:10 83:20
**move**
29:20 39:23 41:17
**moved**
17:13 34:24
**movement**
38:12 39:18 44:8
47:9,11,13 59:5
60:9,18
**moving**
41:18
**multiple**
25:22,24 68:10
**Murder**
13:7
**muster**
57:14

**N**

**named**
38:15 55:13
**names**
20:19 21:1,13 30:23
31:3
**naming**
21:15
**natural**
13:10
**nature**
7:17
**NAUGHT**
112:13
**needed**
106:21
**nephrologist**
86:22,23
**Nicholas**
50:24
**nickname**
17:23 18:13
**normal**
95:8,11 108:24
**Northern**
5:1
**Nos**
99:2
**notice**
4:20 96:9,10 105:4,8
**November**
15:8,12 20:11 22:13
93:10 97:8
**nuisance**
92:16
**null**
75:7
**number**
4:16 6:22 13:20
**numerous**
10:11

**O**

**occasion**
80:21
**occasions**
68:10
**occurred**
22:5 85:6
**October**
16:17 20:14 34:24
50:7 58:8 66:22 67:4
90:24 93:14 97:18
103:9 105:10
**offender**
28:11 108:23
**offender's**
104:8,15
**offense**
24:7 36:20 40:19
45:3 46:9 62:12
81:8,13,14
**offenses**
35:18 62:19
**offensively**
52:9
**offhand**
31:1
**officer**
21:7 23:19 28:21
38:12 43:16,17,18
44:8 47:10,11,13
49:6 57:9 60:9,18
74:3 76:2 78:22
87:14,24 88:19
95:15 104:17 107:5,
15
**officer's**
104:18
**officers**
21:10 47:3 52:5
55:17 56:1,9,15,19
59:6
**official**
107:5
**officials**
25:8
**open**
34:14,15
**opportunity**
86:11
**option**
111:14
**order**
46:16
**organizational**
36:13
**outlined**
27:13
**overview**
51:7
**overwhelmed**
98:4
**overworked**
54:15,16

**P**

**p.m.**
112:15
**pack**
37:14 76:20
**pages**
99:15
**paint**
64:18
**paper**
75:1
**paperwork**
6:12 11:13 31:2

55:19 74:17 77:18
102:18
**paramilitary**
29:2
**parole**
13:12
**part**
30:9 61:15 100:22
109:13
**past**
10:23 23:21 98:12
**PC**
16:21 34:20,21
**peeling**
64:16
**pen**
102:18
**pending**
4:24 9:7,9 19:15
30:4,13,18 31:8
**penitentiary**
64:7
**people**
23:24 41:10 48:13,
14,16 53:22 55:1
56:12 69:12
**perfectly**
10:22
**period**
19:18
**permit**
87:2
**person**
54:5,11 67:16
**personal**
40:11 43:5 68:22
86:12,16
**personally**
68:8
**perspective**
38:9
**Pfister**
106:13
**phase**
70:10
**phone**
39:10
**phones**
39:17
**phonetic**
21:6,8
**physical**
89:22 90:12,23 91:4
**piece**
74:24 84:17
**place**
19:11 25:16 27:22
36:20 40:18 45:2
54:24 60:14 61:2
64:16 65:3 76:4
77:17
**plain**
28:19
**plaintiff**
7:7
**plead**
31:18
**point**
107:14
**pointed**
23:6 79:23
**pointing**
52:6
**police**
37:14
**policy**
58:6
**Pontiac**
14:6,7,15,21 15:6,14
34:6 37:19 44:15

**90:18 101:3,8,11,16**
**population**
23:23
**portion**
107:23 108:7,18
**position**
59:2,17
**positions**
61:9
**possibly**
44:17
**Pounding**
90:3
**pounds**
90:19
**prearranged**
37:16
**precedent**
28:24
**prepare**
12:16,20
**present**
66:2,3
**presided**
37:5 82:18 83:4,6
**pressure**
5:19 6:3 87:18 88:6
90:2,8,10 92:20,24
93:2,24 111:5
**pretty**
59:23 65:12
**prevent**
97:14,18
**previous**
15:5
**prior**
7:13 14:4,14 15:11,
15 16:19 18:8 19:21,
24 20:3 33:19 40:9
41:24 52:13 65:1
69:10,16 83:2 86:23
94:5 105:21
**privileges**
91:19
**problem**
54:4,6,14 59:9 64:21
72:15
**procedural**
24:10 77:2 106:22
**procedural-wise**
28:14
**procedure**
4:22 25:18 29:22,23
43:13 48:4 61:1
63:18 73:19
**procedures**
25:16,17 26:9,10,12,
15 27:12 29:8 40:20
48:6,7 57:15,19 70:8
79:23 110:4
**proceedings**
112:14
**process**
24:11 26:3 49:9,15
51:6 53:12 57:13
72:19 73:1 84:22
95:8,11 105:3 106:5,
7,8,22 107:10
**processed**
57:6
**processes**
24:10
**produced**
9:16
**promulgated**
24:24
**proper**
110:21
**property**
33:12 77:7 78:16
86:6,10,11,12,14,16,



17 89:15,23 90:4,6
93:6 98:16 102:15
110:18,19
**prosecuted**
80:7
**protest**
78:11
**provide**
37:20 104:7,14
112:10
**prowess**
72:15
**purely**
10:24
**purpose**
53:24
**purposes**
73:5
**pursuant**
4:20
**push**
57:20
**pushed**
94:8
**Pushing**
68:22
**put**
17:10,14 19:22
33:10 34:15,19
39:20 48:23 51:16
70:9 72:18 87:15,21
89:15,18,21 90:22
105:13 106:10,11
**records**
31:20 32:1

---

**Q**

**quality**
66:11
**question**
8:19,21 9:7,8,22
25:3 30:4 109:7,16
**questions**
8.4 10:18 12:6 30.8
111:8
**quick**
8:3
**quizzing**
10:20
**quote**
70:7
**quoted**
24:20
**quoting**
24:18

---

**R**

R-A-N-G-E
73:24
R-I-L-E-Y
4:14
**raise**
64:24
**ran**
58:11 60:15
**Range**
70:16 72:10 73:10,
24 80:16,19
**read**
23:10 37:24 38:4
40:16 62:9,10 77:15
81:5 108:9
**reading**
23:10 52:1 84:18
**ready**
6:16
**real**
54:19
**realize**
52:3

**reason**
10:9 11:5 29:5 52:23
53:13 58:8 60:5 64:7
67:15 72:7 78:24
79:16 109:24
**reasoning**
109:20
**reasons**
33:9
**reassigned**
48:14
**recall**
7:16 13:2 14:20 21:1
30:23 33:9 36:21
103:22
**receive**
18:21 96:14,19
100:24 102:6
**received**
13:9 19:2 21:21,23
29:11 90:14 91:7
97:13,17 100:18
107:11,21
**receiving**
92:11 94:3 103:22
**recent**
98:7
**recognize**
99:12,15 103:1
**record**
4:10,16 76:24 97:6
98:23 99:5 106:5
110:7
**reflect**
4:18
**refused**
38:2,3 47:14
**regulations**
26:8 72:1
**release**
45:15 77:11,12
**relief**
110:15,20
**remember**
8:12 9:20,23,24
10:12 11:1,2,17
12:1,10,12 21:12
33:2 98:9,10
**remembered**
82:13
**remove**
59:19
**renal**
94:16
**rephrase**
8:7
**replaced**
110:18
**report**
24:5 27:10 32:17,23
101:21
**reporter**
8:14 102:21 110:12
111:12 112:12
**reports**
20:22,23 110:16
**represent**
5:7
**required**
10:21 24:15,16 25:9
26:8 27:20 28:11,12,
21 40:20 104:6
109:16 110:1,2
**reserve**
111:15 112:5,7
**resign**
75:2
**resolve**
54:7,8

**respect**
111:11
**respond**
54:17 98:11
**responded**
105:5,7 106:14
**responding**
62:7
**response**
42:8,12,22,23 80:11
95:14,16,20,21,22
96:20 100:11,12,17,
23,24 103:21,23
104:2,10,15,18
105:6 106:20
107:12,22,24 108:5,
10
**rest**
21:13 69:6
**restate**
8:6 10:22
**restore**
77:16
**restored**
77:19
**restraining**
51:21
**resubmit**
107:7,8 108:2,3
109:24 110:3
**result**
89:23 90:4,13,24
**resulting**
91:6,8,9
**results**
54:9
**retaliate**
51:9 61:20 73:10
**retaliated**
38:6 43:19 55:5
**retaliating**
48:10 50:13
**retaliation**
19:15 31:13 40:14,
22 44:23 45:5 47:17
48:3 50:10 52:12,20
53:2 57:23 61:18
63:3,7,24 68:12
71:14 74:9 75:10,12
76:12,14 78:17
80:14 85:11,14 86:3
**retaliatory**
16:10 52:23 53:16
62:4 63:12 68:18
70:19 77:8 87:10
**retired**
85:19
**return**
108:20
**review**
12:19 88:5 107:12,
23 108:6,18 111:19
112:8
**rewrite**
48:9 71:2,8,11
73:15,22
**rewrote**
71:9 76:6 79:6
**Rights**
54:12
**Riley**
56:3 62:12 71:7
**Riley-el**
4:4,11,20,23 99:1
112:11
**roll**
60:21
**rolling**
22:17
**rotate**
39:5 47:14

**rotated**
39:1 49:13
**rotating**
48:23
**rotation**
40:5
**round**
69:12 109:5
**rounds**
52:16 80:3
**rule**
24:19,20 46:5 70:9
84:14
**ruled**
107:9
**rules**
4:21 8:3 21:17 22:1,
4,22 23:10 24:3,4
25:8,9,13,14 26:8
27:5,6,8,11,19,21,
22,24 28:1,2,4,6,7,9,
12,15,16,22 29:16
52:2 71:17,24 72:9
77:15 80:18 84:13
108:13
**rumor**
44:3
**rumors**
43:24 45:19 46:22
**run**
6:12 8:2
**runs**
61:8

---

**S**

S-H-A-W
74:2
**safeguard**
48:7 57:12
**SAITH**
112:13
**salty**
92:14
**sat**
50:1,2
**Saturday**
39:19,24 88:23 89:1,
3
**scar**
76:24
**scenario**
84:1
**scheduled**
86:23
**secluded**
41:2,3
**section**
24:8 84:18
**seeking**
110:15,22,24
**seg**
18:22 34:11,23 35:6,
9,13 41:9,13 45:14
67:21,23 68:1,2,4
77:12,13 79:14
93:13
**segregation**
14:10,11 33:5,10,15,
22 34:3 35:4 64:8
**send**
16:8 29:9 43:11
87:13 96:21 107:14,
17 111:17,22 112:9
**sending**
88:2,21 101:24
**sentence**
13:8,11
**separate**
7:20

**September**
16:3
**sergeant**
41:17
**serve**
22:6,15
**set**
28:18 96:24 105:17
**setup**
29:1
**Seventh**
106:24
**shackled**
41:18
**Shannon**
4:8,12,15,18 5:5,6
98:23 99:4 112:9
**Shaw**
74:1
**shift**
58:20 59:3,4,10
61:6,7
**ship**
61:8 86:14
**shipments**
89:2
**shipped**
44:15 69:6,9,13,14
76:21 86:16 87:8
**shipments**
88:12,15,23,24
101:7 102:15
**shot**
110:6
**show**
12:7 26:23 32:4
40:15 102:23 108:12
**showed**
46:3
**shower**
17:10,14
**showing**
54:11
**sick**
65:1,2 78:13
**sicker**
65:4
**sifting**
10:5
**sign**
18:23 74:16,18
95:16
**signature**
95:17 100:3 103:13
106:14 107:19
111:15 112:1,5,6
**signed**
20:21 22:7,11,16
23:4 44:24 45:11
47:18 51:2 58:24
61:14 63:5,15,22
67:17 68:13,15
78:20 79:18 81:19
107:3 108:17
**signing**
45:5 48:2 50:18
68:18 80:13
**signoff**
21:18 29:13 57:5
63:4 73:4 96:4 105:4
107:8 110:2
**simply**
63:3 68:8
**single**
84:19
**singular**
93:16
**sir**
5:6 9:7,9 14:4 15:6
18:21 20:24 33:21
65:8 86:1 93:9 97:13
103:18 111:14,24

**sit**
11:1 20:24 43:7
**situation**
58:1 75:6 88:16 90:7
91:10 93:5,9,12,15
95:4
**skip**
57:19
**skipped**
87:2
**small**
38:24 39:9
**smiling**
69:5
**snatching**
19:24
**Snyder**
97:3 107:1
**socialize**
18:14
**sort**
10:19
**sound**
84:8
**source**
46:13 62:15,17
81:14
**south**
39:16
**speaking**
42:20,21 62:5
**special**
89:3
**specific**
69:22 95:6 108:4
**specifically**
11:6 21:15 27:18
39:2 44:21 48:22
58:7 60:11,14 72:11
78:13 82:3 92:22
93:1 97:22 108:12
**spell**
4:9,12
**spelled**
44:6
**spoke**
42:16 79:21
**spreading**
56:5
**staff**
28:23 38:21 42:8,11,
13,14 43:1,2,8,9
45:21,23 49:5,12,21,
22 51:22 52:4,6
54:13,16 59:15,16
60:20 64:21,22
65:14 71:2 72:2
80:16 88:3,5
**stage**
94:15
**stalled**
75:15,16
**stalling**
68:19 73:7
**stamped**
110:8,10
**start**
30:6
**started**
66:16 72:22 73:6
84:12,13 85:21
94:20
**state**
4:8,15 10:16 22:4,22
24:4 25:2 27:19
31:10,11 36:19
40:17,19 45:2 46:8,
15,17 62:13,20
70:15 76:3 97:1
102:17



stated
10:14 38:15 40:6
42:19 46:13,14 71:7
84:21
statement
37:20
states
46:10 62:13,16,18
81:12 101:18
Stateville
13:15 14:1,16,18
15:5,17,19 16:1,7
19:11,16 33:5 34:4,8
65:7,11 70:6 75:19
88:24 89:1,6,9,11
101:9,15
stating
21:22 70:7 76:6,9
106:14,21
status
16:23 64:5
stay
17:5
stayed
87:22
STG
36:13 76:4 83:23
84:2,9
stickler
27:22
stop
9:10 97:8 110:18
stopped
58:6 69:10
straight
60:1 101:13
stress
51:5 92:4 93:4,5
strike
52:10 78:12,13
stroke
92:14
stuff
32:6 33:17 35:21
40:22 64:1,17,20
65:23 67:6,11 69:17
70:10 75:2 85:4
91:22
submit
58:21 108:23
substantiated
108:21
substantive
111:21
sue
21:9
sued
61:24 82:10
suffer
89:22 90:12,23
suing
5:8 20:16 36:3 43:15
47:7 49:24 51:1
58:21 61:11 63:10
67:15 68:6 70:16
74:2 78:18 79:1
82:16 85:4
Sunday
39:19
supposed
11:21 21:16 25:1,7
27:5,6,7 28:5,15
29:4,23,24 39:6
46:8,15 48:5,8 51:3,
7,8 57:12 62:18
71:24 74:19 77:11,
16 82:19 86:20
88:11,12,14 92:2,6,
18
sworn
4:2,5

system
94:22

T

takes
92:13
taking
11:11 60:8 93:6
talk
12:15 18:1 23:11
42:11,14 43:7 49:21
58:12 70:4 88:8
talked
23:15 49:21 52:13,
22 68:10 70:21,22,
24 71:15 72:5 73:12,
15,17 79:22 80:3,6,9
81:3 82:2 88:3
talking
8:21,23 30:7 35:20
41:3,9 51:24 56:2,9,
18 69:7,15 74:24
81:10
Tarry
78:18 79:17
telling
37:14 62:23 69:13
72:13
testified
4:6
testify
6:5 11:21
testifying
5:12
testimony
5:11
tests
29:7
Theodore
47:6
thing
5:20 43:3 52:3 53:19
56:13 68:16 74:5
81:24 85:6,15 86:12
91:16 102:8
things
11:3 57:4 76:21
thinking
27:4 72:15
Thornton
97:3 107:1
thought
27:16
threw
23:20
ticket
20:8 21:20,22 22:6,
7,8,11,16,23,24
23:1,5 25:5,10,14
27:16 29:12 32:7
33:3 34:9 36:18,22
37:4,7,9 40:16,17
41:6,11,14 44:17,19
45:1,5,12,16 46:7,10
47:19,20,24 48:2
50:4,7,12 51:23
53:9,10 56:24 57:2,
10,14,18 61:13,14
62:8,9,16,20,21
63:4,5,15,16,23
68:15,19 70:23 71:2,
6,10 72:2 73:15
74:12,14 75:11,12,
23 76:1,3,6,10,15,
18,19,23 77:1,4,9,
10,14,16 78:2,15,21
79:4,20 80:1,8,13
81:5,8,20 82:19,24
83:3,5,9,22,23 84:2,
9 90:13 91:1,7,17

97:12,17 98:14,16
102:10,13
tickets
21:12,19 26:2 35:10
44:24 51:23 63:14
67:17,19,20 68:14
86:1
time
9:2 14:17 15:5,18
17:1,6 19:18 22:5
33:11 34:12 35:8
36:19 40:18 44:12,
16 45:2 46:11 52:18
58:10 64:3 65:1 66:5
79:13,14 80:22
88:14 93:13 94:20
timeframe
21:23 47:19 56:17
57:19 71:19 73:13
80:9 83:17
timely
104:19
times
6:20 33:7,22 58:12,
13
titled
106:11
today
5:11 6:5,15 9:19
11:1 12:17,20 19:10
20:24 111:8
told
34:16 40:1 48:18
58:4 62:7,15 70:2
71:1,4,7,11 72:5,6,
10,11 76:7 77:21,22
80:15,16,20,21,23,
24 83:16,17 88:1,20
105:2 106:23
Torry
21:6
totality
91:10
totally
9:7
tours
23:12
training
26:11 29:6,10
transcript
111:11,18
transfer
16:7,10 86:19 87:10
transferred
34:5 37:15,19 86:8,
9,21,24 101:18
102:9
tray
92:9,12,13,17
treat
5:23
treated
38:20 39:7
treating
39:8
treatment
7:19,24 31:7 66:15
87:11
tripping
69:18
trust
111:23
Tuesday
89:17 98:19
tunnel
39:21,22,24
turn
38:2
turned
75:16

turns
72:17
twists
72:17
Tylenol
5:21,22 6:4
type
32:6 64:17,20 68:21
110:14

U

uhh
11:7 29:7 46:4 50:22
66:10,11 74:16
75:18 87:14 94:14
96:2
UIC
55:23,24 86:21 87:2
Um-hmm
86:17 99:8 108:16
111:16 112:3
umm
19:21 22:20 24:23
32:11 52:4 67:5,15
80:2 82:9 101:12
unauthorized
33:12 76:3 98:16
uncontrollable
92:24 93:3
understand
5:10 8:4 10:17 29:18
49:8
understood
8:10
Unit
16:21
units
64:6
Unrestrained
90:2
upholding
62:2,4

V

verbal
8:13 37:23
violation
28:1
violations
54:18
void
75:8

W

W-R-I-G-H-T
85:23
wait
8:16,20 22:14 72:20
95:14,19
waiting
73:2
waive
112:1,5
walk
39:21 69:2
Walker
97:2 107:1
wall
64:15
wanted
53:20 69:22
warden
20:20 38:14,15
48:21 51:2,17,18
53:4,11 58:5 60:2
72:23,24 78:20 96:3,
15,21 101:24 105:4,

14 106:11,13 107:3,
4,12,17 108:2,4,17
warden's
95:17 107:21
ways
95:6
week
58:12,13 74:19
weekend
89:17
weight
5:12 90:17,18
weights
39:9,16
wheel
71:12
William
4:4,11,19
Williams
78:18 81:17
Williams's
79:17
wing
17:8,9 23:7 34:21,22
52:17 68:9 70:4,5,6
78:6
wintertime
39:12
word
10:13 43:1
work
23:24
working
54:2 94:6,7
works
12:5 61:2 95:2
Wright
82:15 85:3
writ
53:21 55:2,3,17,23
56:9,18 64:12 67:2
write
27:10 32:7 46:6
99:24
writer
55:3
writes
76:19
writing
26:1 48:19 51:22
53:22 55:2 56:4
58:2,14 59:22 64:12,
17,20 65:10 67:2
83:14 85:24 105:9
writs
55:16,17,21 56:11,
16
written
24:7,8 37:23 99:21
103:11 104:8
wrong
23:17 26:3 52:7
83:24
wrote
11:13,14,15 20:8
34:9 37:9 38:1,18
41:5,14 45:1,15
48:13,18 56:14,16
61:22 62:8 71:6
73:14 83:15 92:10
102:5,10,11,16
104:19 106:9

X

X-HOUSE
16:20,21,24 17:6
20:10 34:14,15,16,
20 78:6 89:18,21

Y

yard
38:17,20,22,24 39:9,
16,20 48:12,13,17
58:7,11,12,15 83:14,
15 85:4
year
14:21 20:9 34:6,7,11
38:21 43:22 46:20
67:22,23 68:4 72:21
81:8 84:2,4,10 91:12
years
11:10,11,15 23:21
25:23,24 26:4 33:23
34:1 35:6 67:21



SCANNED AT STATEVILLE CC and E-mailed
5-28-19 by CK 65 pages
date    initials    No.

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS.
EASTERN DIVISION

William D. Riley EL    B03069
Plaintiff,

v.

Salvador Godinez et. al.
Defendant

)
)
)
) Case No. 15 CV 11180
) Honorable Judge John Z. Lee
) Magistrate Judge Young B. Kim

## PROOF/CERTIFICATE OF SERVICE

TO: U.S. District Court Clerk
"Prisoner Correspondence"
219 S. Dearborn St.
Chicago, Illinois 60604

TO: Colleen M. Shannon A.A.G.
100 W. Randolph St. 13 Floor
Chicago, Illinois 60601

TO: _____

TO: _____

PLEASE TAKE NOTICE that on ___May 24___, 20_19_, I have placed the documents listed below in the institutional mail at ___Stateville___ Correctional Center, properly addressed to the parties listed above for mailing through the United States Postal Service: ___E-filing in the Law Library___

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

DATE: ___5/24/19___

[All Rights Reserved, UCC 1-308]
/s/ William D. Riley EL ©TM
NAME: William D. Riley EL ©TM
IDOC#: B03069
Stateville Correctional Center
P.O. BOX 112
Joliet ___, IL 60434-0112